**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 19, 2005

CITY OF GROSSE POINTE PARK,

    Plaintiff-Appellee,

v

No. 125630

MICHIGAN MUNICIPAL LIABILITY
AND PROPERTY POOL,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH (except CORRIGAN, J.).

CAVANAGH, J.

Plaintiff city of Grosse Pointe Park had a practice of discharging sewage into a nearby creek when its sewer system became overtaxed during, for example, heavy periods of rain. As a result of these discharges, the residents who lived near the creek filed a lawsuit against the city. Defendant Michigan Municipal Liability and Property Pool was the city's insurer and provided a defense in the lawsuit under a reservation of rights. Although the pool covered other claims regarding sewage backups into homes and businesses, the pool refused to cover claims regarding

the discharges into the creek on the basis of the insurance policy's pollution exclusion clause.

In this insurance coverage case, we must decide whether the insurance policy's pollution exclusion clause is ambiguous and whether extrinsic evidence may be examined in this particular case to aid in the construction of the policy. We hold that this pollution exclusion clause is not ambiguous; therefore, consideration of extrinsic evidence as a construction aid is not appropriate. Further, we conclude that the city's discharges fell within the scope of the pollution exclusion provision and, thus, coverage was properly denied on this basis.

Because we conclude that the pollution exclusion clause applies, we must also decide whether the pool is nonetheless estopped from enforcing this clause because of its practice of covering sewage backup claims or because of the manner in which it provided a defense to the city. We hold that under these facts, the pool is not estopped from enforcing the pollution exclusion clause. The pool timely reserved its rights under the policy, and the city was aware of the reservation. While the city claims to have suffered prejudice as a result of its reliance on a belief that the underlying lawsuit would be covered, this belief was not justifiable under the facts presented in this case.

2

Accordingly, the decision of the Court of Appeals is reversed, and we remand this case to the trial court for entry of an order of summary disposition in favor of the pool.

## I. Facts and Proceedings

In 1938, plaintiff city of Grosse Pointe Park entered into a contract with the city of Detroit to use Detroit's sewer system. Under the terms of the contract, Grosse Pointe Park acquired the right to pump the contents of its sewer line into an interceptor sewer for transport to Detroit's treatment plant. Further, Grosse Pointe Park was permitted under the contract to build a pump station and a discharge pipe. If Grosse Pointe Park's sewer flow exceeded eighty-four cubic feet a second and its line became overtaxed, the discharge pipe would allow Grosse Pointe Park to discharge the overflow into Fox Creek. Fox Creek is a tributary located in Detroit, but rests close to the Detroit-Grosse Pointe Park border.

At the time, Grosse Pointe Park had what is known as a combined sewer system, whereby sewage and rainwater are transported to a treatment plant in a single sewer line. If, for example, there was a heavy rainfall and the capacity of the sewer system became strained, both sewage and rainwater would flow into the basements of buildings

3

connected to the city's sewer line.  To relieve the overflow and prevent basement backups, the city would pump sewage and rainwater into Fox Creek.  Beginning in about 1940, the city began discharging overflow from the combined sewer system into Fox Creek.  Soon after the first discharges, residents near Fox Creek began to complain of this practice.  Nonetheless, this practice continued until 1995, roughly fifty-five years.[1]

Defendant Michigan Municipal Liability and Property Pool is a group self-insurance pool created by certain local governments.  See MCL 124.5.  Every year, beginning in 1985 and running through 1998, Grosse Pointe Park purchased one-year, occurrence-based liability policies from the pool.  Each policy period ran from August 1 to July 31.  While these policies were in effect, Grosse Pointe Park residents made numerous claims against the city for sewage backups into their homes and businesses, and the pool covered these claims.  At issue in this case is the policy issued on August 1, 1994, and effective through July 31, 1995.

---

[1] Grosse Pointe Park now uses a separated sewer system, whereby sewage and rainwater are collected and transported in separate sewer lines.  Further, the city has blocked the discharge pipe leading into Fox Creek.

4

Underlying this case is a class action filed in Wayne Circuit Court against the city by residents who lived near Fox Creek, *Etheridge v Grosse Pointe Park* (Docket No. 95-527115NZ).[2] The *Etheridge* complaint was filed on September 14, 1995, and the plaintiffs alleged that their homes were flooded by the city's discharge of sewer overflow into Fox Creek on July 24, 1995. Because of this discharge, as well as the city's long-term practice of discharging into Fox Creek, the plaintiff class alleged claims for trespass, nuisance, trespass/nuisance, gross negligence, and a taking; also alleged were third-party beneficiary claims arising under the contracts between Grosse Pointe Park and Detroit. Grosse Pointe Park submitted the *Etheridge* complaint to the pool for defense and indemnification coverage.

On October 6, 1995, the pool sent a letter to the city, indicating that it would provide the city a defense, but that it was reserving its rights under the policy. The letter provided, in pertinent part:

> Our review of the [*Etheridge*] Complaint reveals that if judgment or damages are awarded based on certain allegations, the judgments based on those allegations may not be covered by the

---

[2] The *Etheridge* complaint also named the city of Detroit as a defendant.

coverage contract. The purpose of this letter is to point out the allegations and exposures that may not be covered, and to formally advise you that we will defend the entire action, with your cooperation, but will <u>not</u> pay any damages not covered by our contract. In legal terms, we are reserving our rights to restrict payments to those owed under the coverage contract.

* * *

Please be advised that if there is any judgment against the City of Grosse Pointe Park for eminent domain, a discharge of any pollutants, or an intentional act, the Michigan Municipal Liability & Property Pool reserves the right not to indemnify Grosse Pointe Park for said damages.

After noting the allegations and exposures, among other things, the pool's letter referred the city to section V of the insurance policy and specifically quoted the following language from that section—the pollution exclusion clause:

In addition to the specific exclusions in SECTION I—COVERAGES A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY, B—PERSONAL AND ADVERTISING INJURY LIABILITY, C—MEDICAL PAYMENTS, D—PUBLIC OFFICIALS ERRORS AND OMISSIONS, AND E—AUTO, this coverage does not apply to:

d. bodily Injury or Property Damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(1) At or form [sic] any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any Member;

(2) At or from any premises, site or location which is or was at any time used by or fro [sic] any Member or others for the handling,

6

storage, disposal, processing or treatment of waste;

(3) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or fro [sic] may [sic] Member or any person or organization for whom you may be legally responsible, or

(4) At or from any premises, site or location on which any Member or any contractors or subcontractors working directly or indirectly on any Member's behalf are performing operations:

(a) if the pollutants are brought on or to the premises, site or location in connection with such operations by such Member contractor or subcontractor; or

(b) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

* * *

Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

The pool received all the pleadings and participated in the *Etheridge* litigation by attending meetings, hearings, and facilitation. Notably, the pool also continued to cover basement backup claims during the *Etheridge* lawsuit. Settlement was ultimately reached in the *Etheridge* lawsuit, whereby Grosse Pointe Park and Detroit would each pay the plaintiffs $1.9 million and take the necessary action to stop the discharges into Fox Creek.

7

The pool then notified Grosse Pointe Park that indemnification coverage would be denied. Nonetheless, Grosse Pointe Park finalized the *Etheridge* settlement and filed this declaratory judgment action.[3] Both parties moved for summary disposition, and the trial court concluded that the pool was equitably estopped from invoking the pollution exclusion clause to deny coverage because the pool had previously paid basement backup claims without incident.[4] Thus, the trial court granted the city's motions for summary disposition and ordered the pool to indemnify the city for the amount of the *Etheridge* settlement. The pool appealed this decision.

In a two-to-one decision, the Court of Appeals reversed the trial court's determination that the pool was estopped as a matter of law from denying coverage, reasoning that a question of fact existed on this issue.

---

[3] In count I, the city alleged that the pool breached the insurance contract by failing to provide coverage in the *Etheridge* lawsuit. Count II alleged that the pool breached its duty to timely investigate, decide whether the claims were covered, and timely communicate its decision to deny coverage. In counts III through V, the city alleged alternative theories seeking equitable relief. And count VI alleged a violation of the Michigan Consumer Protection Act.

[4] The trial court also dismissed counts II and VI of the complaint and dismissed counts III through V as moot in light of the relief granted under count I.

8

Unpublished opinion per curiam of the Court of Appeals, issued October 30, 2003 (Docket No. 228347). Moreover, the Court of Appeals majority concluded, among other things, that the city presented a question of fact regarding the parties' intent concerning the application and meaning of the pollution exclusion clause. Because of the pool's practice of paying basement backup claims without invoking the pollution exclusion clause, the Court of Appeals held that extrinsic evidence regarding such payments may reveal an ambiguity in the insurance policy, relying on *Michigan Millers Mut Ins Co v Bronson Plating Co*, 197 Mich App 482; 496 NW2d 373 (1992), aff'd 445 Mich 558 (1994), overruled on other grounds in *Wilkie v Auto-Owners Ins Co*, 469 Mich 41 (2003). Judge O'Connell dissenting in part, asserted that because the policy was unambiguous and the pool reserved its rights under the policy, (1) consideration of extrinsic evidence was unwarranted, and (2) equitable estoppel did not apply.

This Court granted the pool's application for leave to appeal, limited to the issues whether: (1) sewage is a "pollutant" under the applicable insurance policy's pollution exclusion clause; (2) extrinsic evidence may be used to establish an ambiguity in this pollution exclusion

9

clause; and (3) the pool may be estopped from asserting the pollution exclusion clause.[5]

## II. Analysis

We review decisions on motions for summary dispositions de novo. *American Federation of State, Co & Muni Employees v Detroit*, 468 Mich 388, 398; 662 NW2d 695 (2003). Similarly, the proper interpretation and application of an insurance policy is a question of law that we review de novo. *Cohen v Auto Club Ins Ass'n*, 463 Mich 525, 528; 620 NW2d 840 (2001).

### A. Extrinsic Evidence and the Pollution Exclusion Clause

The Court of Appeals observed that although an insurance policy is enforced according to its terms, the contracting parties' intent controls. Further, the Court of Appeals reasoned that because the city had presented evidence that the pool repeatedly paid basement backup

---

[5] 471 Mich 915 (2004). After granting leave to appeal and before this Court heard oral arguments in this case, we granted the pool's motion for immediate consideration but denied its motion to strike the city's brief on appeal. Unpublished order of the Supreme Court, entered March 4, 2005 (Docket No. 125630). In response to the pool's motions, the city filed a brief in opposition to the motions, a motion for immediate consideration, and a motion to supplement the record on appeal. We did not rule on the city's motions before entertaining oral arguments. Thus, we take this opportunity to grant the city's motion for immediate consideration, but deny its motion to supplement the record on appeal.

claims, a question of fact existed with respect to the parties' intent regarding the applicability of the pollution exclusion clause. Relying on *Michigan Millers*, *supra*,[6] the Court of Appeals concluded that the insurance policy was not "so unambiguous that no extrinsic evidence

---

[6] In *Michigan Millers*, the defendant insured submitted discovery requests to the plaintiff and other insurers, desiring information on the plaintiff's handling of certain types of insurance claims. The insurers denied the requests. The trial court agreed that the information sought was irrelevant and assessed sanctions on the defendant. On appeal, the defendant claimed that how the insurers handled past claims was relevant to show whether the term "suit," as used in the contract, was ambiguous. Stated differently, the defendant argued that extrinsic evidence would tend to show that the insurers' construction of "suit" was wrong, or at least ambiguous. The plaintiff asserted that the requested information was irrelevant because: (1) if the term is unambiguous, extrinsic evidence is not admissible to contradict the insurance policy; or (2) if the term is ambiguous, the term is construed against the insurers and in favor of the defendant. The Court of Appeals agreed with the defendant.

The Court of Appeals noted that the plaintiff's rationale ignored "a third principle of evidence. Extrinsic evidence is admissible to show the *existence* of an ambiguity." *Michigan Millers*, *supra* at 495 (emphasis in original). Accordingly, the Court of Appeals found that the information the defendant sought was relevant to show the insurers' prior interpretations of the term "suit." Thus, the Court of Appeals vacated the trial court's order assessing sanctions. However, the Court of Appeals noted that the purpose for which the defendant wanted the information was rendered moot because the Court of Appeals actually interpreted the term "suit" and concluded that a "suit" had been brought.

of the parties' intent can be considered."  Slip op at 7 n 9.  We disagree with the Court of Appeals rationale.

"An insurance policy is much the same as any other contract."  *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992).  "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties.  To this rule all others are subordinate."  *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924).  In light of this cardinal rule, and to effectuate the principle of freedom of contract, this Court has generally observed that "[i]f the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning; but if it is ambiguous, testimony may be taken to explain the ambiguity."  *New Amsterdam Cas Co v Sokolowski*, 374 Mich 340, 342; 132 NW2d 66 (1965); see also *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 111; 595 NW2d 832 (1999).  "However, we will not create ambiguity where the terms of the contract are clear."  *Id*.

In light of these principles, we note that consideration of extrinsic evidence generally depends on some finding of contractual ambiguity.  Ambiguity in written contracts can fairly be said to consist of two types: patent and latent.  A patent ambiguity is one "that clearly appears on the face of a document, arising from the

12

language itself." Black's Law Dictionary (7th ed). See also *Hall v Equitable Life Assurance Society*, 295 Mich 404, 409; 295 NW 204 (1940). Accordingly, resort to extrinsic evidence is unnecessary to detect a patent ambiguity. A latent ambiguity, however, is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Black's Law Dictionary (7th ed). Because "the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist." *McCarty v Mercury Metalcraft Co*, 372 Mich 567, 575; 127 NW2d 340 (1964). In other words, "where a latent ambiguity exists in a contract, extrinsic evidence is admissible to indicate the actual intent of the parties as an aid to the construction of the contract." *Id*. Thus, the question becomes whether an ambiguity exists in this insurance policy's pollution exclusion clause.

This insurance policy provides that coverage is excluded when bodily injury or property damage results from "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." The

policy further defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." The insurance policy, however, does not specifically define "waste." Where a term is not defined in the policy, it is accorded its commonly understood meaning. *Allstate Ins Co v McCarn*, 466 Mich 277, 280; 645 NW2d 20 (2002) (*McCarn I*). "Waste" is commonly understood to include sewage.[7] In other words, "waste" is commonly understood to include urine and feces, bathwater and dishwater, toilet paper, feminine napkins and tampons, condoms, and the countless other substances typically introduced into a sewer system.

We believe that the term "waste" in this policy is not patently ambiguous and the text of the policy fairly admits of but one interpretation.[8] We must observe, however, that

---

[7] See, e.g., *American Heritage Dictionary* (2d college ed, 1982) (defining "waste" to include "[a] useless or worthless by-product . . . [g]arbage; trash . . . [t]he undigested residue of food eliminated from the body").

[8] See, e.g., *Raska v Farm Bureau Mut Ins Co of Michigan*, 412 Mich 355, 362; 314 NW2d 440 (1982) ("Yet if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear."). See also *Bianchi v Automobile Club of Michigan*, 437 Mich 65, 70-73;

(continued…)

14

we do not make this determination lightly.  Again, the cardinal rule in the interpretation of contracts is to ascertain and give effect to the parties' intentions. *McIntosh*, *supra* at 218.  We are also mindful of Professor Corbin's warning that when judges attempt to enforce a contract according to their own understanding of what is plain and clear, these judges run the risk of substituting their own judgment for the intent of the parties and, thus, making a contract for the parties that was never intended. See *Stark v Budwarker, Inc*, 25 Mich App 305, 314; 181 NW2d 298 (1970).[9]  Indeed, such a result would actually undermine

---

(…continued)
467 NW2d 17 (1991); *Auto Club Ins Ass'n v DeLaGarza*, 433 Mich 208, 213; 444 NW2d 803 (1989).

[9] Professor Corbin observes:

On reading the words of a contract, a judge may jump to the instant and confident opinion that these words have but one reasonable meaning. A greater familiarity with dictionaries and the usages of words, a better understanding of the uncertainties of languages, and a comparative study of more cases in the field of interpretation, will make one beware of holding such an opinion. A judge who believes that contract terms can have a single, reasonable meaning that is apparent without reference to extrinsic evidence of the parties' intentions "retires into that lawyer's Paradise where all words have a fixed, precisely ascertained meaning; where [people] may express their purposes, not only with accuracy, but with

(continued…)

the freedom of contract principle. Nonetheless, we conclude that this pollution exclusion clause is not patently ambiguous because an ambiguity does not readily appear in the text of the policy. Again, courts are not permitted to "create ambiguity where the terms of the contract are clear." *Masters, supra* at 111. Therefore, we will apply this pollution exclusion clause as written unless we determine that a latent ambiguity arises from a matter outside of the text of the policy.

We initially observe that it is well-established that "[i]n construing [contractual provisions] due regard must be had to the purpose sought to be accomplished by the parties as indicated by the language used, read in the light of the attendant facts and circumstances. Such intent when ascertained must, if possible, be given effect and must prevail as against the literal meaning of

---

(…continued)
> fulness [sic]; and where, if the writer has been careful, a lawyer . . . may sit in [a] chair, inspect the text, and answer all questions . . . ." Such a belief is unrealistic, for "the fatal necessity of looking outside the text in order to identify persons and things, tends steadily to destroy such illusions and to reveal the essential imperfection of language, whether spoken or written." [5 Corbin, Contracts, § 24.7, pp 32-33 (rev ed, 1998) (internal citations omitted).]

expressions used in the agreement." *W O Barnes Co, Inc v Folsinski*, 337 Mich 370, 376-377; 60 NW2d 302 (1953). Further, attendant facts and circumstances explain the context in which the words were used and may reveal the meaning the parties intended. *Sobczak v Kotwicki*, 347 Mich 242, 249; 79 NW2d 471 (1956).[10] In this respect, the detection of a latent ambiguity unquestionably requires consideration of factors outside the policy itself. *McCarty*, *supra* at 575. Therefore, extrinsic evidence is admissible to prove the existence of the ambiguity, and, if a latent ambiguity is proven to exist, extrinsic evidence may then be used as an aid in the construction of the contract. *Id.*; see also *Goodwin, Inc v Orson E Coe Pontiac, Inc*, 392 Mich 195, 209-210; 220 NW2d 664 (1974). In light of the attendant facts and circumstances of this case, we conclude that a latent ambiguity does not exist.

---

[10] See also 5 Corbin, Contracts § 24.7, p 31 (rev ed, 1998) ("It is therefore invariably necessary, before a court can give any meaning to the words of a contract and can select a single meaning rather than other possible ones as the basis for the determination of rights and other legal effects, that extrinsic evidence be admitted to make the court aware of the 'surrounding circumstances,' including the persons, objects, and events to which the words can be applied and which caused the words to be used." [internal citations omitted]); see also 2 Restatement Contracts, 2d, §§ 200-203.

17

We are unpersuaded by Grosse Pointe Park's arguments that the pool's practice of covering basement backup claims somehow shows that this pollution exclusion clause is ambiguous. The pool's practice of paying backup claims does not render the clause susceptible to two reasonable, yet mutually exclusive, interpretations. Indeed, the pool's practice does not change our conclusions that the parties intended for coverage to be excluded when property damage results from the actual discharge of pollutants, that pollutants include waste, and that the term "waste" include urine and feces, bathwater and dishwater, toilet paper, feminine napkins and tampons, condoms, and the countless other substances typically introduced into a sewer system. Indeed, a latent ambiguity does not exist under this policy because when we consider how the clause applies or has been applied, it cannot be said that the clause was intended to have a different meaning than that reflected in the text of the policy. Accordingly, after considering factors outside the four corners of this policy, we cannot detect any latent ambiguities.[11] In other

_____

[11] We disagree with Justice Young's proposal to adopt a clear and convincing standard with respect to proving the existence of a latent ambiguity. In support of this standard, Justice Young relies on a broad reading of *Quality Products & Concepts Co v Nagel Precision, Inc*, 469

(continued…)

words, the extrinsic evidence introduced by Grosse Pointe

Park does not prove the existence of a latent ambiguity.

Thus, it is unnecessary to examine outside factors as an

aid in construing this policy.

---

(…continued)
Mich 362; 666 NW2d 251 (2003). However, *Nagel* was concerned with the circumstances under which a contract can be *waived or modified*. Accordingly, where a party alleges waiver or modification, that party is alleging that both contracting parties mutually assented to *alter or amend* the existing contract. Therefore, a clear and convincing standard in this context makes sense. This standard, however, does not necessarily make sense where a party alleges the existence of a latent ambiguity.

When a party alleges the existence of a latent ambiguity, that party, contrary to Justice Young's implications, is not attempting to alter or amend the bargain struck. Rather, the party argues that application of the contract's terms would be inconsistent with the parties' intent. Thus, the party alleging the existence of a latent ambiguity is arguing that the parties' intent should be effectuated-the cardinal rule of contract interpretation. However, the party alleging the existence of a latent ambiguity is not arguing that the contract was altered or amended.

Accordingly, *Nagel* is distinguishable and we believe that Justice Young's broad reading of that decision to support his view cannot withstand scrutiny. Further, the other decisions Justice Young uses to support his rationale are distinguishable as well. In our view, none of these cases supports his preference to impose a clear and convincing standard on a party arguing the existence of a latent ambiguity. While Justice Young may be inclined to broadly extend "common theme[s]," without more we must decline in this instance to adopt Justice Young's preference to impose a clear and convincing standard on contracting parties.

19

In sum, we conclude that this pollution exclusion clause is not patently ambiguous. Further, review of extrinsic evidence neither leads to the detection nor proves the existence of a latent ambiguity. Thus, because an ambiguity does not exist, extrinsic evidence is inadmissible as an aid in the construction of this policy. Accordingly, we hold that the Court of Appeals erred when it concluded that the insurance policy was not "so unambiguous" and, thus, extrinsic evidence was generally admissible.

Because we believe that this policy's pollution exclusion clause is unambiguous, we will enforce it according to its terms and consistent with the parties' intent. When we accord "waste" the meaning intended by the parties, as well as its commonly understood meaning, we have little difficulty concluding that the city discharged "pollutants" into Fox Creek. Thus, we hold that the city's discharges fell under the purview of this insurance policy's pollution exclusion clause.

## B. Estoppel

Having concluded that the discharges fall under the pollution exclusion clause, we must next decide whether the pool is nonetheless estopped from enforcing the clause. "The principle of estoppel is an equitable defense that

20

prevents one party to a contract from enforcing a specific provision contained in the contract." *Morales v Auto-Owners Ins Co*, 458 Mich 288, 295; 582 NW2d 776 (1998). For equitable estoppel to apply, the city must establish that (1) the pool's acts or representations induced the city to believe that the pollution exclusion clause would not be enforced and that coverage would be provided, (2) the city justifiably relied on this belief, and (3) the city was prejudiced as a result of its reliance on its belief that the clause would not be enforced and coverage would be provided. See, e.g., *Morales*, *supra* at 296-297.

The city maintains that the pool should be estopped from enforcing the pollution exclusion clause because of the pool's practice of covering basement backup claims before, during, and after the underlying litigation in this case, without ever invoking the pollution exclusion clause. According to the city, the pool's failure to enforce this clause, as well as the manner in which the pool conducted the defense, led the city to believe that the underlying litigation would be covered. The city maintains that were it not for this belief, it would have conducted discovery and settlement negotiations differently. Thus, the city contends that it was prejudiced by its reliance on its

21

belief that coverage would be provided in the underlying suit.

The Court of Appeals, in part, remanded this matter to the trial court for consideration of this issue, concluding that a question of fact remained whether the pool should be estopped from asserting the pollution exclusion clause. We disagree. Under the facts of this case, a reasonable trier of fact could not conclude that the city satisfied its burden.

In this case, it cannot be said that the city's reliance on the pool's actions or representations was justified. At the beginning of the underlying litigation, the pool notified the city that it would provide a defense in the underlying litigation, "but will _not_ pay any damages not covered by our contract. In legal terms, we are reserving our rights to restrict payments to those owed under the coverage contract." The pool timely notified the city that if any judgment was entered against the city for the discharge of pollutants into Fox Creek, the pool was reserving the right to not indemnify, specifically quoting the pollution exclusion clause. We find the pool's reservation of rights particularly damaging to the city's estoppel theory.

"[W]hen an insurance company undertakes the defense of its insured, it has a duty to give reasonable notice to the insured that it is proceeding under a reservation of rights, or the insurance company will be estopped from denying its liability." *Kirschner v Process Design Assoc, Inc*, 459 Mich 587, 593; 592 NW2d 707 (1999). Here, the pool duly reserved its rights, and the city was aware of the reservation. Accordingly, the city was on notice that the pool might not indemnify it. Moreover, by the city's own account, the pool had never before reserved its right to contest coverage under the auspices of the pollution exclusion clause. Yet the city claims that it was justified in believing that the pool would indemnify it. We believe, however, that these facts, when viewed in the light most favorable to the city, weigh against a finding of estoppel.

The city was clearly on notice that the pool might not provide coverage under the pollution exclusion clause. While the city was aware that the pool had never sought to enforce the pollution exclusion clause before the underlying litigation, this Court had not been presented with any evidence that the pool reserved its rights on the basis of the pollution exclusion clause with regard to any other claim. Because the pool timely notified the city at

the start of the underlying litigation that it was reserving its rights, the pool specifically invoked the pollution exclusion clause, the pool had done neither before, and, arguably, the nature of the discharges differed from the nature of the basement backups, we fail to see how the city was justified in believing that indemnification would be provided in this particular case.[12]

---

[12] We disagree with Justice Young's expansive reading of *Kirschner*, *supra*. Relying on that decision, Justice Young posits that even if Grosse Pointe Park could prove all the elements for the application of estoppel, the city will still be unprotected because estoppel can never be applied to extend coverage, period. In our view, Justice Young misreads *Kirschner*. *Kirschner* does not set forth the inflexible rule that Justice Young prefers. Indeed, Justice Weaver's *Kirschner* opinion was careful to avoid making sweeping generalizations or extending *Ruddock v Detroit Life Ins Co*, 209 Mich 638; 177 NW 242 (1920), beyond its intended bounds. Further, *Kirschner*, *supra* at 594-595, prudently observed that in some instances, courts have applied the doctrine of estoppel to bring within coverage risks not covered by the policy. *Kirschner* then provided a few examples–examples that we believe are not exhaustive nor could reasonably be inferred to be exhaustive. Justice Young further laments that we do not give credence to the "prominent language" from *Kirschner* that emphasizes that "[t]he application of . . . estoppel is limited . . . ." *Post* at 21 n 35, quoting *Kirschner*, *supra* at 593-594. We respectfully disagree. Rather, we believe that our evenhanded reading of *Kirschner* considers *all* of the opinion's "prominent language." For example, this Court observed that the "application of waiver and estoppel is limited, and, *usually*, the doctrines will not be applied to broaden the coverage of a policy . . . ." *Kirschner*, *supra* at 594 (emphasis added).

(continued…)

24

In sum, we find the city's position untenable. No reasonable trier of fact could conclude that the city was justified in believing that indemnification was certainly going to be provided in this case when the pool reasonably notified the city to the contrary. Because we find that the city's reliance was unjustified, the estoppel claim fails and it is unnecessary for us to consider whether the city was prejudiced by its reliance. Moreover, we believe that the manner in which the pool provided a defense in this particular case was not inconsistent with the reservation of rights or the pool's practice of paying basement backup claims. Thus, the pool is not estopped from enforcing the pollution exclusion clause, and the trial court erred in concluding otherwise.[13]

---

(…continued)

In any event, because Grosse Pointe Park's estoppel claim fails and the discharges fall under the purview of the pollution exclusion clause-as Justice Young likewise concludes-it is unnecessary to determine whether estoppel could be used to bring the discharges within coverage. In other words, because Grosse Pointe Park's estoppel claim fails, it is unnecessary to adopt Justice Young's preferred rule, decide whether coverage in this case should be expanded, or depart from this Court's prior precedent.

[13] In *Kirschner*, *supra*, I joined Justice KELLY's concurrence. I do not retreat from the view expressed in that opinion. Our state would be well-served by a rule that requires an insurer to timely notify the court, the insured, and other parties that it is reserving its rights

(continued…)

Accordingly, the decision of the Court of Appeals is reversed and we remand this case to the trial court for entry of an order of summary disposition in favor of the pool. MCR 7.302(G)(1).

### III. Conclusion

Under the facts of this case, we hold that the city's discharges fell within the purview of the pollution exclusion clause. This pollution exclusion clause is not ambiguous; therefore, consideration of extrinsic evidence as aid in the construction of the policy is not appropriate. Further, we hold that under these facts, the pool is not estopped from enforcing the pollution exclusion clause. Therefore, the decision of the Court of Appeals is reversed and we remand this case to the trial court for entry of an order of summary disposition in favor of the pool.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

---

(…continued)
under the policy. Further, a court should be empowered to refuse to effectuate an untimely reservation of rights when the court determines that the insured was prejudiced. In this case, however, the pool timely reserved its rights and the city was made aware of the reservation of rights.

CITY OF GROSSE POINTE PARK,

    Plaintiff-Appellee,

v                                            No. 125630

MICHIGAN MUNICIPAL LIABILITY
& PROPERTY POOL,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH (except CORRIGAN, J.).

YOUNG, J.

    Although this Court is equally divided on the appropriate legal analysis, this Court is unanimous regarding the proper result. All members of this Court agree that the insurance policy at issue is not latently ambiguous and that it must therefore be enforced as written. According to the plain language of the policy's pollution exclusion clause, it is clear that sewage is a "pollutant." Moreover, this Court is in unanimous agreement that equitable estoppel is not applicable. Accordingly, all members of this Court agree that the judgment of the Court of Appeals must be reversed and this case remanded to the trial court for entry of an order

granting the Michigan Municipal Liability and Property Pool's motion for summary disposition.[1]

While all justices conclude that sewage is a "pollutant" under the clear and unambiguous language of the policy's pollution exclusion clause, the justices joining this opinion believe that principles of contract enforcement require special proofs when a contracting party seeks to vary the terms of a written agreement by alleging latent ambiguity. Thus, while extrinsic evidence generally may be introduced to demonstrate the existence of a latent ambiguity, we conclude that a court must presume that the contracting parties' intent is manifested in the actual language used in the contract itself unless the party alleging the existence of the latent ambiguity rebuts this presumption by proving with clear and convincing evidence

_____

[1] It is important to note that neither Justice Cavanagh's opinion nor ours has garnered a majority. Therefore neither establishes binding precedent. As we stated in *People v Anderson*, 389 Mich 155, 170; 205 NW2d 461 (1973), overruled in part on other grounds by *People v Hickman*, 470 Mich 602 (2004),"The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases. If there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties."

that such an ambiguity does indeed exist. Here, we conclude that the city of Grosse Pointe Park has not presented clear and convincing evidence to demonstrate that a latent ambiguity actually exits. We further conclude that the Pool is not equitably estopped from denying coverage because, under the well-established rule articulated by this Court in *Ruddock v Detroit Life Ins Co*[2] and reiterated in *Kirschner v Process Design Assoc, Inc*,[3] estoppel will not be applied to expand coverage beyond the particular risks covered by the actual insurance policy itself.

## I. FACTS & PROCEDURAL HISTORY

In 1938, Grosse Pointe Park and the city of Detroit entered into an agreement under which Grosse Pointe Park was permitted to discharge overflow sewage into Fox Creek, a tributary near the Grosse Pointe Park-Detroit border. Release of excess sewage into Fox Creek was necessary because Grosse Pointe Park's "combined" sewer system—a single sewer line used to transport both sewage (e.g., from toilets) and storm water runoff—would become overtaxed during periods of heavy rainfall. If Grosse Pointe Park

---

[2] 209 Mich 638; 177 NW 242 (1920).

[3] 459 Mich 587; 592 NW2d 707 (1999).

3

did not use Fox Creek as a release valve during such periods, sewage would back up into the basements of homes and businesses. It is undisputed that from 1940 to 1995, Grosse Pointe Park released overflow rainwater and sewage into Fox Creek hundreds of times.[4]

Each year from 1985 to 1998, Grosse Pointe Park purchased annual "occurrence-based" commercial general liability policies from the Pool, a self-insurance pool comprised of local governments.[5] During this period, under

---

[4] Grosse Pointe Park has built and now operates a "separate" sewer system, which uses different lines for sewage and rainwater runoff. As such, Grosse Pointe Park no longer releases overflow sewage into Fox Creek.

[5] Municipal insurance pools are statutorily authorized under MCL 124.5, which provides:

> (1) Notwithstanding any other provision of law to the contrary, any 2 or more municipal corporations, by intergovernmental contract, may form a group self-insurance pool to provide for joint or cooperative action relative to their financial and administrative resources for the purpose of providing to the participating municipal corporations risk management and coverage for pool members and employees of pool members, for acts or omissions arising out of the scope of their employment, including any or all of the following:
>
> (a) Casualty insurance, including general and professional liability coverage.

(continued…)

successive annual policies, the Pool paid numerous insurance claims submitted by Grosse Pointe Park residents for sewage backups that occurred in their basements. It did so without issuing reservation of rights letters based on the policies' pollution exclusion clauses, unlike in the present case. The particular insurance policy at issue covers the period from August 1, 1994, to August 1, 1995.

The current dispute derives from an underlying class action (the *Etheridge* litigation) brought by Grosse Pointe Park residents against the city for discharges made into Fox Creek in July 1995. In the *Etheridge* complaint, filed on September 14, 1995, the class action plaintiffs sued

---

(…continued)

    (b) Property insurance, including marine insurance and inland navigation and transportation insurance coverage.

    (c) Automobile insurance, including motor vehicle liability insurance coverage and security for motor vehicles owned or operated, as required by section 3101 of the insurance code of 1956, 1956 PA 218, MCL 500.3101, and protection against other liability and loss associated with the ownership of motor vehicles.

    (d) Surety and fidelity insurance coverage.

    (e) Umbrella and excess insurance coverages.

5

Grosse Pointe Park under various trespass, nuisance, and negligence theories for sewage backups that occurred in their homes and businesses. In addition to basement backup claims, the *Etheridge* plaintiffs also submitted insurance claims for alleged damage caused to boats, docks, seawalls, garages, lawns, shrubbery, and outdoor furniture resulting from the city's release of sewage into Fox Creek.

On October 6, 1995, three weeks after the *Etheridge* suit was filed, the Pool provided the city a defense under a reservation of rights letter. In the letter, the Pool specifically quoted the insurance policy's pollution exclusion clause and warned the city that it had not yet determined whether it would cover any liability arising from the *Etheridge* suit. The letter concluded by stating:

> Please be advised that if there is any judgment against the City of Grosse Pointe Park for eminent domain, *a discharge of any pollutants,* or an intentional act, the Michigan Municipal Liability & Property Pool *reserves the right not to indemnify* Grosse Pointe Park for said damages. [Emphasis added.]

The Pool subsequently assigned an outside adjusting firm to monitor the *Etheridge* lawsuit. During the course of the *Etheridge* litigation, the Pool's adjuster received copies of all pleadings and attended meetings with the litigants. The Pool also paid in-house sewage backup

6

claims involving residences and businesses unrelated to the *Etheridge* suit while the *Etheridge* litigation was proceeding. After several facilitation sessions, in August 1997, the *Etheridge* plaintiffs agreed to settle with Grosse Pointe Park for $1.9 million.[6]

Before the *Etheridge* settlement was finalized, however, the Pool informed the city that the Pool's outside counsel did not believe that the Pool was obligated to indemnify the city given the policy's pollution exclusion clause. Subsequently, the Pool formally notified the city that coverage would be denied. Nevertheless, the city proceeded to approve the $1.9 million settlement with the *Etheridge* plaintiffs a few months later.

The city then filed suit in the Wayne Circuit Court seeking a declaratory judgment that the Pool was obligated to indemnify the city for the *Etheridge* settlement. After lengthy discovery, both the Pool and the city filed cross-motions for summary disposition pursuant to MCR 2.116(C)(10). Ruling in favor of the city, the trial court held that the Pool was equitably estopped from denying coverage under the pollution exclusion clause because the

---

[6] A similar settlement was reached with the city of Detroit, which was also named as a defendant in the class action, for $1.9 million.

7

Pool had paid prior backup claims made by Grosse Pointe Park residents.[7]

In a two-to-one decision, the Court of Appeals reversed the trial court's holding that the Pool was equitably estopped from invoking the pollution exclusion clause.[8] The Court of Appeals held that a question of fact existed with regard to the estoppel claim and therefore remanded the case to the trial court for further proceedings. It also held that the Pool's payment of prior backup claims was "extrinsic evidence" of ambiguity in the insurance policy and remanded the case to the trial court to determine "the parties' intent as to the exclusion's applicability . . . ." Judge O'Connell dissented, arguing

---

[7] Ruling from the bench, Judge Amy P. Hathaway stated:

It's clearly an issue of equity, which I'm not sure is going to necessarily trump the contract claim, at least in front of the Court of Appeals. But in this case we have a contract that was paid and paid and paid again under this pollutant, this sewage, and now there's a reservation of rights issue. I've got a big problem. To the point where I'm going to deny the motion, the Defendant's motion, and grant the inapplicability of the pollution exclusion based on estoppel.

[8] Unpublished opinion per curiam of the Court of Appeals, issued October 30, 2003 (Docket No. 228347).

that extrinsic evidence should not be considered because the insurance policy was clear and unambiguous. He further argued that equitable estoppel was not applicable because the Pool timely provided the city a reservation of rights letter. We granted the Pool's application for leave to appeal.[9]

## II. STANDARD OF REVIEW

A motion for summary disposition under MCR 2.116(C)(10), which tests the factual support of a claim, is reviewed by this Court de novo.[10] Similarly, the interpretation of an insurance policy is also a question of law that is reviewed by this Court de novo.[11]

## III. ANALYSIS

### A. IS SEWAGE A "POLLUTANT" UNDER THE INSURANCE POLICY'S POLLUTION EXCLUSION CLAUSE?

The insurance policy at issue provides:

*Section V – General Exclusions*

In addition to the specific exclusions in SECTION I – COVERAGES A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, B – PERSONAL AND

---

[9] 471 Mich 915 (2004).

[10] *Oade v Jackson Nat'l Life Ins Co*, 465 Mich 244, 250-251; 632 NW2d 126 (2001); *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999).

[11] *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003); *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002).

ADVERTISING INJURY LIABILITY, C – MEDICAL PAYMENTS, D – PUBLIC OFFICIALS ERRORS AND OMISSIONS, AND E – AUTO, *this coverage also does not apply to:*

\* \* \*

d. Bodily Injury or Property Damage *arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:*

\* \* \*

*Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.* [Emphasis added.]

As this Court has previously held, "The principles of construction governing other contracts apply to insurance policies."[12] As such, the foremost duty of a court in construing an insurance policy is to determine the intent of the contracting parties.[13] In doing so, a court must always begin with the actual language used by the parties in the insurance policy itself.[14] If the text of the insurance policy is clear and unambiguous, the contract

---

[12] *Farm Bureau Mut Ins Co v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999).

[13] *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003); see also *Nikkel, supra* at 566; *Morley v Automobile Club of Michigan*, 458 Mich 459, 465; 581 NW2d 237 (1998).

[14] *Quality Products, supra* at 375.

must be enforced as written.[15] "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law."[16]

It is difficult to imagine an insurance policy that is clearer or more explicit than the one found in the present case. The pollution exclusion clause defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant . . . ." The word "contaminant," given its plain and ordinary meaning,[17] is "something that contaminates," and "contaminate" is defined as "to make impure or unsuitable by contact or mixture with something unclean, bad, etc.; pollute; taint . . . ."[18] It is undeniable that Fox Creek was "made impure" and "tainted" by the sewage that the city released. The record indicates that the sewage contained dirt, debris, garbage, condoms, feminine hygiene products, urine, feces, dishwater, toilet paper, cleaning fluids, and compounds containing E.coli.

---

[15] *Id.; Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003); *Nikkel, supra* at 566.

[16] *Quality Products, supra* at 375.

[17] In *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 112; 595 NW2d 832 (1999), this Court unanimously held that courts are to "interpret [undefined] terms of an insurance contract in accordance with their 'commonly used meaning.'" (Citations omitted.)

[18] Random House Webster's College Dictionary (1995).

Therefore, because these "solid" and "liquid" materials are "contaminants," the sewage the city released is necessarily a "pollutant" under the plain terms of the insurance policy.

This conclusion is bolstered by the fact that the pollution exclusion clause also provides specific examples of "pollutants," such as "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Given the composition of the sewage described above, it is clear that most, if not all, of these specific examples of "pollutants" were found in Fox Creek. We conclude, therefore, that the sewage released by the city into Fox Creek is within the scope of the policy's pollution exclusion clause.

B. THE ROLE OF EXTRINSIC EVIDENCE IN ILLUMINATING A LATENT AMBIGUITY

The city argues that the word "pollutant" is latently ambiguous and that extrinsic evidence must be introduced to give the word the true meaning that the parties intended. According to the city, the Pool's payment of prior basement backup claims demonstrates that the parties intended the word "pollutant" to have a meaning different than the one used in the insurance policy itself.

We find the city's argument unpersuasive. The argument that the city is advancing is actually one of equitable estoppel, not contract interpretation. The city

12

is attempting to rely on the Pool's payment of similar basement sewer backup claims as a way to require the Pool to cover the present claim.  Accordingly, the city's argument sounds more in equity than in the law of contracts.  For the reasons discussed in part III(C) of this opinion, we are unpersuaded by the city's equitable estoppel argument.  Nonetheless, to the extent that the city argues that a latent ambiguity exits, we disagree.

There are generally two categories of ambiguity that may arise in a contract:  patent and latent.[19]  A *patent* ambiguity is one that is "apparent upon the face of the instrument, arising by reason of inconsistency, obscurity or an inherent uncertainty of the language adopted, such that the effect of the words in the connection used is either to convey no definite meaning or a double one."[20]  In contrast, a *latent* ambiguity "'arises not upon the words of the will, deed, or other instrument, as looked at in

---

[19]  See 11 Williston, Contracts (4th ed), § 33:40, p 816.

[20]  *Zilwaukee Twp v Saginaw-Bay City R Co*, 213 Mich 61, 69; 181 NW 37 (1921); 11 Williston, Contracts (4th ed), § 33:40, p 816  ("Patent ambiguities are those that are apparent on the face of the document . . . .").

themselves, but upon those words when applied to the object or to the subject which they describe.'"[21]

By asserting the existence of a latent ambiguity, the city illustrates an inherent tension found in contract law. On the one hand, it is well-settled law that when a contract is clear and unambiguous on its face, a court will not consult extrinsic evidence and will enforce the contract as written.[22] On the other hand, a party generally is permitted to introduce extrinsic evidence to demonstrate the existence of a latent ambiguity—one that is not apparent on the face of the contract.[23]

---

[21] *Zilwaukee Twp, supra* at 69 (citation omitted); 11 Williston, Contracts (4th ed), § 33:40, p 816 ("[L]atent ambiguities are those which appear only as the result of extrinsic or collateral evidence showing that a word, thought to have but one meaning, actually has two or more meanings.").

The classic example of a latent ambiguity is found in the traditional first-year law school case of *Raffles v Wichelhaus*, 2 Hurl & C 906; 159 Eng Rep 375 (1864). In *Raffles*, two parties contracted for a shipment of cotton "to arrive ex Peerless" from Bombay. However, as it turned out, there were two ships sailing from Bombay under the name "Peerless." Thus, even though the contract was unambiguous on its face, there was a *latent* ambiguity regarding the ship to which the contract referred.

[22] *Quality Products, supra* at 375; *Cruz v State Farm Mut Automobile Ins Co*, 466 Mich 588, 594; 648 NW2d 591 (2002); *Nikkel, supra* at 566; *Morley, supra* at 465.

[23] *Hall v Equitable Life Assurance Society of the United States*, 295 Mich 404, 408; 295 NW 204 (1940) ("It is

(continued…)

In balancing these two seemingly conflicting principles of contract law, a court must never cross the point at which the written contract is *altered* under the guise of contract *interpretation*.[24] Indeed, it is during litigation that a party's motivations are the most suspect and the party's incentives the greatest to attempt to achieve that which the party could not during the give-and-take of the contract negotiation process. As this Court stated in *Nikkel*, a "court may not read ambiguity into a policy where none exists."[25] Therefore, in clarifying the proper role of extrinsic evidence in illuminating a latent ambiguity, it is helpful to turn to basic principles of contract law.

As stated, the primary goal of contract interpretation is to ascertain and effectuate the intent of the contracting parties.[26] The law presumes that the

---

(…continued)
a well-settled rule that extrinsic evidence is admissible to show that a latent ambiguity exists.").

[24] *Wilkie, supra* at 51 ("This approach, where judges . . . rewrite the contract . . . is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written . . . .").

[25] *Nikkel, supra* at 568.

[26] *Quality Products, supra* at 375 ("In interpreting a contract, our obligation is to determine the intent of the
(continued…)

15

contracting parties' intent is embodied in the actual words used in the contract itself.[27]  A rule to the contrary would reward imprecision in the drafting of contracts.  More significant, it would create an incentive for an aggrieved party to enlist the judiciary in an attempt to achieve a benefit that the party itself was unable to secure in negotiating the original contract—a proposition this Court flatly rejected in *Wilkie*.[28]  These principles require that,

---

(…continued)
contracting parties."); *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924) ("The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate."); *Mills v Spencer*, 3 Mich 127, 135 (1854) ("In the construction of a contract, we are to look at the intention of the parties."); 17A CJS, Contracts, § 308, p 321  ("The primary and overriding purpose of contract law is to ascertain and give effect to the intentions of the parties . . . ."); 17A Am Jur 2d, Contracts, § 345, p 332 ("[T]he fundamental and cardinal rule in the construction or interpretation of contracts is that the intention of the parties is to be ascertained, and effect is to be given to that intention . . . ."); 1 Restatement Contracts, 2d, §201(1), p 83 ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.").

[27] *Michigan Chandelier Co v Morse*, 297 Mich 41, 49; 297 NW 64 (1941)("'The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.'" [citation omitted]); see also *United States ex rel Int'l Contracting Co v Lamont*, 155 US 303, 310; 15 S Ct 97; 39 L Ed 160 (1894); 17A Am Jur 2d, Contracts, § 348, p 336  ("[T]he parties are presumed to have intended what the terms clearly state.").

[28] *Wilkie, supra* at 51.

when a party asserts that a latent ambiguity exists, a court presume that the contracting parties' intent is manifested in the actual language used in the contract. The party alleging the existence of the latent ambiguity may rebut this presumption only by proving, through clear and convincing evidence, that such an ambiguity does indeed exist.

This Court emphasized these same bedrock principles of contract law in *Quality Products*, which held that contracting parties are free, with *mutual* assent, to modify a contract notwithstanding a written anti-modification or anti-waiver clause present in the original agreement.[29] We recognized that the anti-modification clause contained in the written contract was presumptive of the parties' intent as a matter of law, but also that "the parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed."[30] We held, therefore, that contracting parties are always entitled mutually to modify the underlying contract, but the party

---

[29] *Quality Products, supra* at 372-373.

[30] *Id*. at 372.

asserting that a modification has occurred must present *clear and convincing evidence* to that effect.[31]

Although *Quality Products* involved contract *modification*, not contract *interpretation*, the same core principles of contract law apply in the present case. It must be presumed that the city and the Pool intended the actual language that they used in the insurance policy. We conclude, therefore, that the city, in asserting the existence of a latent ambiguity, bears the burden of proving by clear and convincing evidence that such an ambiguity actually exists.[32]

---

[31] *Id*. at 373.

[32] Justice Cavanagh asserts that we are relying on a "broad reading" of *Quality Products* and that the principles adopted by this Court in *Quality Products* should be limited to cases involving contract modification or waiver and not to cases when one party asserts the existence of a latent ambiguity. *Ante* at 18 n 11. There is no principled basis for the distinction Justice Cavanagh draws. In both cases— a claimed contract modification/waiver and the claimed existence of a latent ambiguity—a party to a contract is asserting that the written terms of the contract should not be enforced. This Court has gone to great lengths in the past few terms to clarify the law so that contracts will be enforced *as written*. See *Wilkie v Auto Owners Ins Co*, 469 Mich 41; 664 NW2d 776 (2003); *Klapp v United Ins Group Agency, Inc*, 468 Mich 459; 663 NW2d 447 (2003). By applying a clear and convincing standard of proof for latent ambiguities, this Court would simply be adhering to the common theme we articulated in *Quality Products* and all our other recent contract cases: that contracts will be

(continued…)

The city has failed to satisfy that burden of proof. The reality is that none of the parties to this insurance contract asserts that the term "pollutant" contained in the exclusion clause means something different when city sewage is discharged into Fox Creek or when it backs up into individual Grosse Pointe Park residences. Indeed, the Pool has conceded that the source of the pollution in both cases is the same.[33] Thus, the record reflects no evidence that one party contends that "pollutant" means something different from how that term is defined in the policy.

---

(…continued)
enforced *as written* unless substantial evidence to the contrary is presented.

Justice Cavanagh also states that we do not cite decisions other than *Quality Products* for the clear and convincing rule discussed above. We are unaware of the bedrock jurisprudential rule on which Justice Cavanagh relies: that a legal principle duly adopted by this Court is not binding unless there are other related cases with the same holding. *Quality Products* is a binding decision of this Court and the doctrinal underpinnings of that case are applicable here. As such, it must be given due regard. Nevertheless, as we indicate above, the clear and convincing rule regarding latent ambiguities is not a new concept, but an embodiment of the precise contract principle to which this Court has steadfastly adhered in our recent contract jurisprudence: that contracts will be enforced *as written* unless compelling evidence to the contrary is offered. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003); *Klapp*, *supra* at 467; *Wilkie*, *supra* at 51-52, 62-63; *Rednour v Hastings Mut Ins Co*, 468 Mich 241, 251; 661 NW2d 562 (2003); *Nikkel*, *supra* at 566-568.

[33] Pool reply brief at 4.

That being the case, there is no "latent ambiguity" requiring the introduction of extrinsic evidence to show that "pollutant" means something other than how it is defined in the contract. Rather, the city is attempting to bootstrap its estoppel argument—that the Pool paid similar claims involving pollutants so it is precluded from denying indemnification on this claim—to manufacture a latent ambiguity claim. Such a tactic violates basic contract construction principles and should be rejected for that reason.

## C. EQUITABLE ESTOPPEL

The city argues that, even if sewage is a "pollutant" under the policy's pollution exclusion clause, the Pool should nonetheless be equitably estopped from denying coverage. It asserts that the Pool's payment of prior basement backup claims and the Pool's involvement in monitoring the *Etheridge* litigation led the city to believe that the Pool would indemnify any eventual settlement that was reached. According to the city, it would have altered its strategy in the *Etheridge* litigation had it known that the Pool would not cover the settlement and, therefore, it was prejudiced by the Pool's actions.

In general, "[t]he principle of estoppel is an equitable defense that prevents one party to a contract

from enforcing a specific provision contained in the contract."[34] Although equitable estoppel appears to be broad in theory, the doctrine is rather limited in practice. As then-Chief Justice Weaver stated in writing for the Court in *Kirschner,* "The application of . . . estoppel is limited, and, usually, the doctrine[] will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that *were expressly excluded from the policy.*"[35]

Indeed, the rule discussed in *Kirschner* is well established in Michigan law. In *Ruddock,* the beneficiary of a life insurance policy sought to estop the insurer from invoking the policy's "military service" exclusion clause as a basis for denying payment. This Court expressly rejected the beneficiary's equitable estoppel argument, holding that estoppel will not be applied to broaden

---

[34] *Morales v Auto-Owners Ins Co*, 458 Mich 288, 295; 582 NW2d 776 (1998).

[35] *Kirschner*, *supra* at 593-594 (emphasis added). While Justice Cavanagh cites *Kirschner* for the proposition that an insurer may be equitably estopped from denying coverage if the insurer does not timely reserve its rights, Justice Cavanagh omits the prominent language from *Kirschner* that emphasizes that "[t]he application of . . . estoppel is limited . . . ." *Ante* at 23.

21

coverage beyond the specific risks covered by the policy itself.  This Court stated:

> To apply the doctrine of estoppel and waiver here would make this contract of insurance cover a loss it never covered by its terms, to create a liability not created by the contract and never assumed by the defendant under the terms of the policy. In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract the parties did make.[36]

By asking this Court to hold that the Pool is equitably estopped from denying coverage for the *Etheridge* settlement, the city is essentially requesting this Court to ignore the policy's pollution exclusion clause that the Pool specifically invoked in its reservation of rights letter.  To do so, however, would be to alter fundamentally the nature of the bargain struck between the city and the Pool and to protect the city "against risks that were . . . expressly excluded from the policy."[37]  This Court explicitly rejected this argument in *Ruddock* and *Kirschner*. We do so again today.  Equitable estoppel must not be applied to expand coverage beyond the scope originally

---

[36] *Ruddock*, *supra* at 654.

[37] See *Kirschner*, *supra* at 594.

contemplated by the parties *in the insurance policy as written*. A court must not bestow under the veil of equity that which the aggrieved party itself failed to achieve in negotiating the contract.[38]

Because we believe that *Kirschner* and *Ruddock* are fatal to the city's estoppel claim, unlike Justice Cavanagh, we would not apply the test articulated in *Morales*. Nevertheless, to the extent that the city relies on the principles in *Morales*, its reliance is misplaced. In *Morales*, this Court applied a three-part test to determine whether equitable estoppel should apply: (1) the defendant's acts or representations induced the plaintiff's belief, (2) the plaintiff justifiably relied on its belief,

---

[38] Justice Cavanagh states that we are giving *Kirschner* and *Ruddcok* an "expansive reading" and setting forth an "inflexible rule" regarding the application of estoppel. *Ante* at 24 n 12. To the contrary, we are merely applying the well-established rule this Court adopted in *Ruddock* and reiterated in *Kirschner* that estoppel will not be applied to give the insured a benefit that was never negotiated in the first place. *Ruddock*, *supra* at 654; *Kirschner*, *supra* at 594. Indeed, in our view, it is Justice Cavanagh who is unduly limiting the holding of *Kirschner* by implying exceptions to the *Kirschner* rule beyond the two explicitly recognized: (1) misrepresentation by the insurer and (2) the insurer's failure to provide a timely reservation of rights. *Id.* at 594-595.

and (3) the plaintiff was prejudiced as a result of its belief.[39]

Even assuming, arguendo, that the Pool's payment of prior basement backup claims and its involvement in monitoring the *Etheridge* suit led the city to hope that the settlement would be covered, and that the city actually relied on its mistaken belief, the city's equitable estoppel claim must fail because its reliance was not *justifiable*. Three weeks after the *Etheridge* suit was filed, the Pool sent the city a reservation of rights letter that specifically quoted the policy's pollution exclusion clause. The letter concluded by stating, "Please be advised that if there is any judgment against the City of Grosse Pointe Park for . . . a discharge of any pollutants, . . . the Michigan Municipal Liability & Property Pool reserves the right not to indemnify Grosse Pointe Park for said damages." Moreover, the Pool frequently reminded the city during the *Etheridge* litigation that "serious coverage issues" remained. Despite all this, and *after* being notified by the Pool that coverage was formally denied, the city still proceeded to

---

[39] *Morales, supra* at 296-297.

finalize the settlement with the *Etheridge* plaintiffs.[40] Any reliance on the part of the city, therefore, was unjustified.[41]  Because there was no *justifiable* reliance, we need not consider whether the city suffered any prejudice on the basis of its reliance; the city's estoppel claim fails as a matter of law.

## IV. CONCLUSION

Sewage is clearly a "pollutant" under the plain language of the policy's pollution exclusion clause. Moreover, while extrinsic evidence may generally be introduced to demonstrate the existence of a latent

---

[40] The City Attorney for Grosse Pointe Park testified in his deposition that "a decision [was made] by the city that it was in the best interests of the city if there was to be no coverage to proceed with a settlement because we were where we were."

[41] Since at least 1911, in the case of *Sargent Mfg Co v Travelers' Ins Co*, 165 Mich 87; 130 NW 211 (1911), this Court has adhered to the rule that a timely reservation of rights letter will protect an insurer against an insured's claims of estoppel.  This Court reiterated this fundamental rule of insurance law in *Kirschner* by noting that an insurer who complies with its "duty to give reasonable notice . . . that it is proceeding under a reservation of rights" will be shielded from subsequent claims of estoppel or waiver. *Kirschner*, *supra* at 593.  Accordingly, if an insurer timely reserves its rights, an insured will generally not be able to sustain a claim of estoppel on the basis that it altered its litigation strategy in reliance on the insurer's payment of previous claims.  To conclude otherwise would be to emasculate completely the entire purpose of the reservation of rights process.

ambiguity, we conclude that a court must presume that the contracting parties' intent is manifested in the actual language used in the contract itself and that the party alleging the existence of the latent ambiguity may rebut this presumption only by proving, through clear and convincing evidence, that such an ambiguity does actually exist. The city has failed to meet this burden of proof. Moreover, any reliance on *Morales* is misplaced. Under *Ruddock* and *Kirschner*, the Pool is not equitably estopped from denying coverage because estoppel will not be applied to broaden coverage beyond the particular risks specifically covered by the policy itself.

The judgment of the Court of Appeals is reversed, and this matter is remanded to the trial court for entry of an order granting the Pool's motion for summary disposition.

Robert P. Young, Jr.
Clifford W. Taylor
Stephen J. Markman

26