**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:         Justices:
Clifford W. Taylor    Michael F. Cavanagh
                      Elizabeth A. Weaver
                      Marilyn Kelly
                      Maura D. Corrigan
                      Robert P. Young, Jr.
                      Stephen J. Markman

FILED DECEMBER 30, 2008

FRANK J. TOMECEK, JR., and JANIS H. TOMECEK,

      Plaintiffs-Appellees,

v                                               No. 134665

ANDREW LUCIAN BAVAS, JOYCE BAVAS, INEZ HILDEGARD BAVAS, STANLEY FRANCIS STASCH, JULIA STASCH, MARTHA STASCH, PATRICIA M. CURTNER, TIMOTHY V. McGREE, PETER A. STRATIGOS, ALICE M. STRATIGOS, PAMELA KRUEGER, DEVEREAUX BOWLY, JR., DAVID N. DERBYSHIRE, ELLEN R. LA FOUNTAIN, JONATHAN RODGERS, ROYAL KENNEDY RODGERS, LEE STAHL, III, and SUSAN STAHL,

      Defendants-Appellants,
and

INDIANA MICHIGAN POWER COMPANY, doing business as AMERICAN ELECTRIC POWER COMPANY, INC., MICHIGAN DEPARTMENT OF LABOR AND ECONOMIC GROWTH, and BERRIEN COUNTY DRAIN COMMISSIONER,

Defendants-Appellees,

and

DANIEL JOHNSON, SCOTT LOESS,
KATHLEEN LOESS, JANE HENKLE,
RICHARD CRAGG, LOIS ZYER, ARTHUR
C. MERTZ REVOCABLE TRUST, PETER
LEVY, BENITA LEVY, LAKESIDE
PROPERTY OWNERS, CHIKAMING
TOWNSHIP, ROBERT FORKER, JR., NEW
BUFFALO SAVINGS BANK FIFTH
THIRD BANK, SHORELINE BANK,
SEMCO ENERGY, INC., SEMCO ENERGY
GAS COMPANY, SBC AMERITECH
CORPORATION, MICHAEL L. JONES,
LAURA L. AVERY, and JULIA E.
PIETRAS,

Defendants.

BEFORE THE ENTIRE BENCH

KELLY, J.

This case involves real property to which plaintiffs seek an easement for the purpose of connecting to a city sewer across the lots of their neighbors. The issues are (1) whether the Land Division Act (LDA)[1] can be used to create substantive property rights, such as a utility easement, (2) whether an easement by necessity for utilities should be allowed in this case, and (3) whether the restrictive covenant that runs with the land in question bars the easement.

The Court of Appeals held that the LDA provides for substantive changes to property rights and gives the trial court the authority to revise the plat to allow a

---

[1] MCL 560.101 *et seq.*

2

utility easement. It also concluded that an easement by necessity for utilities could appropriately be created in this case and that the restrictive covenant does not bar the easement.

We affirm the result of the Court of Appeals opinion and conclude that the original grantors intended to allow utility access to the Tomeceks' property through the central drive easement. We agree that the restrictive covenant does not bar the easement. However, we reverse the Court of Appeals holding that the LDA can alter substantive property rights. Finally, it was unnecessary for the Court of Appeals to address whether an easement by necessity should be recognized in Michigan and applied in this case. Therefore, we affirm the Court of Appeals opinion in part, reverse it in part, and vacate it in part.

FACTS

Plaintiffs Frank and Janis Tomecek own property in the O.T. Henkle subdivision along Lake Michigan in Berrien County. They wish to build a house on their property (Lot 2).[2] Defendants claim that a restrictive covenant that runs with the plat prevents plaintiffs from erecting a building on Lot 2. The covenant states that a house cannot be built on Lot 2 "unless and until a municipal sanitary sewer line is made available to the premises."

---

[2] Plaintiffs' property is shown as "2" on the map at the end of this opinion.

3

Because Lot 2 is landlocked, plaintiffs have an easement[3] (the central easement) over Lots 1 and 3 through which they access their property from Lake Shore Road. Plaintiffs claim that they are entitled to use the central easement to gain access to the municipal sewer line.

A familiarity with the history of the O.T. Henkle subdivision is helpful in understanding this case. In the early 1920s, O.T. Henkle acquired approximately five acres of land on Lake Michigan in Chikaming Township, Berrien County. The property passed from O.T. Henkle to C.W. Henkle, Gladys Farclough, and Jane H. Henkle (collectively referred to as "the original grantors").[4] In 1967, the original grantors conveyed what is now Lot 1 to one of the defendants, reserving an easement for the benefit of Lot 2. The easement runs from Lake Shore Road along the southern boundary of Lot 1.[5]

Over the next few years, the original grantors sold Lots 3, 4, and 5, all subject to an easement running along the southern portion of the property ("the south drive easement").[6] Lots 3 and 4 were also subject to the central drive

---

[3] The easement is shown on the lower center of the diagram appended to this opinion and runs from Lake Shore Road to Lot 2.

[4] Jane Henkle is the mother of plaintiff Janis Tomecek.

[5] The easement is located on the central easement on the map, where the word "Drive" is printed.

[6] The easement is labeled "Drive Easement" and shown on the left side of the map.

4

easement.[7] In 1975, the plat was recorded in the county records. At the time of platting, Lots 3, 4, and 5 used the south drive easement for utilities access[8] and for right-of-way access. Also, in 1975, the original grantors recorded a restrictive covenant prohibiting the construction of a building on Lot 2 until a municipal sanitary sewer service was made available to the premises.[9] Thus, when the property was platted in 1975, both the central and south easements were identically identified as "drive easement" on the plat, and the south easement already had utilities on it.

In 1976, the original grantors conveyed Lot 2 to plaintiffs. When plaintiffs bought Lot 2, the original grantors provided them with a drawing showing a good spot to build a home on the lot.[10]

### PROCEDURAL HISTORY

In 2001, plaintiffs requested a variance from the Chikaming Township Zoning Board of Appeals to construct a home on their lot. When the board granted the variance, defendants appealed, claiming that the restrictive covenant

---

[7] The left half of the central easement, where the word "Easement" appears on the map.

[8] The south easement provided Lots 3, 4, and 5 with telephone and electrical access.

[9] Plaintiffs and defendants disagree about the meaning of "premises" in the restrictive covenant. Plaintiffs contend "premises" refers to the subdivision as a whole, whereas defendants claim it refers exclusively to Lot 2.

[10] In 1969, before plaintiffs acquired the property, the original grantors gave them another drawing showing a desirable location for a home on Lot 2.

prevented plaintiffs from building a home because they did not have sewer access. The trial court granted summary disposition to plaintiffs, ruling that the original grantors intended to allow plaintiffs to build a home on Lot 2. The trial court observed that defendants had already run utility lines on the south easement, and plaintiffs deserved to do the same with their central easement.

A divided Court of Appeals panel affirmed the trial court's decision in a published opinion.[11] It held that the LDA[12] empowered the trial court to revise the plat to include utilities in the central easement. The LDA, it concluded, permits a trial court to do more than merely correct errors; it may alter a plat to affect underlying substantive property rights. The Court of Appeals held, in addition, that plaintiffs were entitled to an easement by necessity for utilities.

STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition.[13] The extent of a party's rights under an easement is a question of fact, and a trial court's determination of the facts is reviewed for clear error.[14] The

---

[11] *Tomecek v Bavas,* 276 Mich App 252; 740 NW2d 323 (2007).

[12] The LDA allows a trial court to vacate, correct, or revise a plat. MCL 560.226(1).

[13] *Blackhawk Dev Corp v Village of Dexter,* 473 Mich 33, 40; 700 NW2d 364 (2005).

[14] *Id.*

proper interpretation and application of a statute presents a question of law that we consider de novo.[15]

THE CENTRAL EASEMENT INCLUDED UTILITY ACCESS AT THE TIME OF PLATTING

We must determine if the central easement running from Lake Shore Road to Lot 2 includes utility access, or if its use is strictly limited to ingress and egress. Under well-established Michigan law, "[t]he use of an easement must be confined strictly to the purposes for which it was granted or reserved."[16] Exacting "magic words" are not required on a plat to create an easement.[17] When interpreting deeds and plats, Michigan courts seek to effectuate the intent of those who created them.[18]

Plaintiffs assert that, when the original grantors platted the subdivision, they assumed that both the south easement and the central easement included access for utilities. Defendants assert the contrary and add that Lot 2 was always intended to remain vacant.

It is undisputed that the central and south easements are identically labeled "drive easement" on the plat. At the time of platting, the central easement was

---

[15] *Eggleston v Bio-Medical Applications of Detroit, Inc,* 468 Mich 29, 32; 658 NW2d 139 (2003).

[16] *Delaney v Pond*, 350 Mich 685, 687; 86 NW2d 816 (1957).

[17] See *Chapdelaine v Sochocki,* 247 Mich App 167, 170; 635 NW2d 339 (2001).

[18] See *Curran v Maple Island Resort Ass'n,* 308 Mich 672, 679-681; 14 NW2d 655 (1944).

used only for ingress and egress to Lot 2; there were no utilities on the easement. However, the south easement was used both as a driveway and for telephone and electrical lines to Lots 3, 4, and 5.

We find a strong inference that the words "drive easement" on the central easement were intended to have the same meaning as "drive easement" on the south easement. We conclude that the original grantors would have labeled the easements differently had they intended to allow utilities on the south easement, but not on the central easement. And we conclude that the original grantors intended the central and south easements to have the same scope: both road access for ingress and egress and utility access.

As early as 1883, Michigan courts recognized that a party using a right-of-way for a particular purpose cannot prevent a subsequent party from making the same use of the property. In *Bell v Todd,* the plaintiffs sought to enjoin the defendant from blocking access to a road that was platted but never constructed.[19] Plaintiff Bell had previously blocked unbuilt roads in the same plat. The Court dismissed the case, stating:

> [I]t also appears that Railroad street south of South street is enclosed and occupied by Bell himself, so that he is doing in his own individual interest in respect to this very street precisely what he seeks to enjoin defendant from doing. It would be preposterous to grant the relief prayed for on his application under such circumstances.[20]

---

[19] *Bell v Todd,* 51 Mich 21; 16 NW 304 (1883).

[20] *Id.* at 28.

Although two streets, not one, are involved here, we believe *Bell* is instructive. Defendants use their "drive easement" for utilities and seek to prevent plaintiffs from using their "drive easement" for the same purpose. In the words of Justice Cooley in *Bell*, to allow such a result would be "preposterous."

It is apparent, also, that the grantors envisioned that a house would be built on Lot 2 and, by extension, that the central easement would include utilities. This may be gleaned from two drawings by C.W. Henkel, one of the original grantors. The first was made in 1969, six years before the subdivision was platted. It shows Lot 2 and the adjacent lot to the east, Lot 1. On Lot 2 is a rectangle with the words "possible house location and dimensions." The central easement is shown on the drawing.

C.W. Henkle made a second drawing in 1978, three years after the subdivision and easements were platted. Like his first drawing, it shows a location on Lot 2 where plaintiffs could build a home. The central easement is visible on the drawing. It is significant that C.W. Henkle included the central easement in his drawings of Lot 2 with a house. He knew then that no house could be erected there until the lot had access to a sewer line. He knew, also, that the central easement was the only likely route to provide that access. Taken together, these drawings provide further evidence of intent that the central drive easement should include utilities.

9

Finally, contrary to the defendants' claim, the wording of the restrictive covenant shows that the original grantors always intended that a house could be built on Lot 2. When attempting to discern the parties' intent, we construe together contemporaneous documents relating to the same transaction.[21] The restrictive covenant on Lot 2 was executed contemporaneously with the plat; therefore, it is relevant in discerning the parties' intent at the time.

It does not make sense that the original grantors would have inserted language regarding a sewer in the restrictive covenant had they intended that no building ever be placed on Lot 2. If they had really intended to forever prevent building on Lot 2, they would have simply covenanted that no building ever be put there. The reference to a sewer makes sense, however, if the grantors' intent was to eventually allow a building on Lot 2. This becomes readily apparent when the geographical limitations of the plat are considered. The plat is approximately five acres in size. Only the eastern half is suitable for housing because a bluff runs along the middle of the property, descending to the beach and Lake Michigan. Therefore, the five lots suitable for residences adjoin each other on roughly the 2.5 easternmost acres of land.

---

[21] *Interstate Constr Co v United States Fidelity & Guaranty Co,* 207 Mich 265, 274; 174 NW 173 (1919).

In 1975, when the subdivision was platted and the restrictive covenant was written, none of the lots had access to a municipal sewer system. Septic tanks[22] were the only plausible alternative for waste management on the lots. However, because of concerns over numerous septic systems and leach fields[23] in the relatively small area, a septic system was not an option for every lot.

Cognizant of this problem, the original grantors likely enacted the restrictive covenant to prevent construction of a house on Lot 2 until municipal sewer service became available to it. Hence, the restrictive covenant prevented overloading the small area of land with septic waste. When a municipal sewer system became available to the plat in the late 1970s, the condition in the restrictive covenant was satisfied. The restrictive covenant had served its purpose.

---

[22] A septic tank is a small-scale sewage treatment system common in rural areas where there is no access to a municipal sewer line. Wastewater enters the septic tank from a connected residence, and solids settle to the bottom. The remaining water flows out of the tank and is absorbed into the soil, which usually filters out the remaining impurities in the water. However, there must be adequate soil area to handle the wastewater coming from the tank or the surrounding area will be damaged. This is especially likely when septic tanks are located on property near a body of water, (like the property in this case that borders Lake Michigan) because the sandy soil can easily become saturated with chemicals. This pollutes the surrounding area and surface water, causing serious harm to fish, plants, and other wildlife. See Craig G. Cogger, *Septic System Waste Treatment in Soil,* <http://cru.cahe.wsu.edu/CEPublications/eb1475/eb1475.html>*,* accessed December 12, 2008; see also *Septic Systems for Waste Water Disposal,* available at <http://www.agwt.org/info/septicsystems.html>*,* accessed December 12, 2008.

[23] A leach field is the area of land where the wastewater from a septic tank is deposited.

From this we conclude that it was the intent of the original grantors that a house could be built on Lot 2 when a municipal sewer became available. We conclude also that the central "drive easement" was intended, like the south "drive easement," to provide access to the sewer and other utilities.

EFFECT OF THE RESTRICTIVE COVENANT

Defendants maintain that the restrictive covenant of 1974 intended to prohibit any building on the property until the end of time. They argue that the plain language of the restrictive covenant reflects this.

The restrictive covenant states, "It is hereby covenanted and agreed that no building, structure or dwelling shall be constructed on Lot 2 of said plat unless and until a municipal sewer line is made available to the premises." Defendants claim that the covenant prohibits building a home on Lot 2 until the owners of Lots 1, 3, and 4, explicitly grant permission to create an easement for municipal sewer service.

This interpretation is not reflected in the words of the covenant. As the trial court pointed out:

> A plain reading of this restriction contradicts Defendant's [sic] argument: if the grantors wanted to forever preclude any construction on Lot 2, the restriction would have stated as much in explicit language by ending the provision after the word "plat" [so that it read "[t]hat it is hereby covenanted and agreed that no building, structure or dwelling shall be constructed on Lot 2 of said plat"]. Defendants' argument in this regard must therefore fail.

The restrictive covenant merely prevented construction on Lot 2 until sewer service became available to that lot.

12

THE LDA CANNOT ALTER SUBSTANTIVE PROPERTY RIGHTS

The LDA provides a process for surveying and marking subdivided property. Property information is compiled on a plat that is then recorded with the local municipality. The LDA allows a circuit court to vacate, correct, or revise a recorded plat.[24] Defendants argue that the LDA permits a court to alter a plat map only to properly reflect existing property rights; it cannot affect the substantive rights of the underlying property owners.

When construing the LDA, we are mindful that our primary goal is to ascertain and give effect to the Legislature's intent.[25] When determining intent, we consider first the language of a statute.[26] The LDA allows a court to "order a recorded plat or any part of it to be vacated, corrected, or revised . . . ."[27] "Plat" is defined in the act as "a map or chart of a subdivision of land."[28]

The LDA defines a plat as a map. A plat is a description of the physical property interests on a particular area of land. A map, by itself, is not a determination of substantive property interests. If one "revises" a map of the United States to show Michigan encompassing half of the country, it does not make it so. The LDA was never intended to enable a court to establish an

---

[24] MCL 560.221.

[25] *Neal v Wilkes,* 470 Mich 661, 665; 685 NW2d 648 (2004).

[26] *Yaldo v North Pointe Ins Co,* 457 Mich 341, 346; 578 NW2d 274 (1998).

[27] MCL 560.226(1).

[28] MCL 560.102(a).

13

otherwise nonexistent property right. Rather, the act allows a court to alter a plat to reflect property rights already in existence.

In this case, the LDA did not create new substantive property rights when the circuit court altered the plat to reflect that the central easement encompasses utility access. This right existed with respect to the central easement since its inception, when the original grantors recorded the central easement intending it to include utilities. The trial court merely used the LDA as the tool to validate property rights that already existed.

CONCLUSION

In 1975, when the O.T. Henkle subdivision was platted, it was the intent of the grantors that the central easement could include utilities. This holding is supported by the fact that, on the plat, the central easement and the south easement are both labeled the same. It is undisputed that the south easement was a driveway and had utilities at the time of platting. The language of the restrictive covenant that runs with the plat supports this holding. The covenant prevented a house from being built on Lot 2 until a municipal sewer system could be made available to the lot. Hence, once a sewer line became available, the covenant allowed a house to be built on Lot 2. Therefore, we affirm the Court of Appeals judgment. However, we reverse its holding concerning the LDA. The LDA cannot be used to create substantive property rights. Regarding the Court of Appeals dicta creating an easement by necessity for utilities, we decline to address whether such an easement is available in Michigan, it being unnecessary to resolve the case. The

14

result reached by the Court of Appeals is affirmed on the basis of the intent of the grantors.


                                        Marilyn Kelly
                                        Clifford W. Taylor



S T A T E   O F   M I C H I G A N

SUPREME COURT

FRANK J. TOMECEK, JR., and JANIS H.
TOMECEK,

       Plaintiffs-Appellees,

v                                                                No. 134665

ANDREW LUCIAN BAVAS, JOYCE
BAVAS, INEZ HILDEGARD BAVAS,
STANLEY FRANCIS STASCH, JULIA
STASCH, MARTHA STASCH, PATRICIA
M. CURTNER, TIMOTHY V. McGREE,
PETER A. STRATIGOS, ALICE M.
STRATIGOS, PAMELA KRUEGER,
DEVEREAUX BOWLY, JR., DAVID N.
DERBYSHIRE, ELLEN R. La FOUNTAIN,
JONATHAN RODGERS, ROYAL
KENNEDY RODGERS, LEE STAHL, III,
and SUSAN STAHL,

             Defendants-Appellants,
and

INDIANA MICHIGAN POWER
COMPANY, doing business as AMERICAN
ELECTRIC POWER COMPANY, INC.,
MICHIGAN DEPARTMENT OF LABOR
AND ECONOMIC GROWTH, and
BERRIEN COUNTY DRAIN
COMMISSIONER,

             Defendants-Appellees,
and

DANIEL JOHNSON, SCOTT LOESS,
KATHLEEN LOESS, JANE HENKLE,
RICHARD CRAGG, LOIS ZYER, ARTHUR
C. MERTZ REVOCABLE TRUST, PETER

LEVY, BENITA LEVY, LAKESIDE
PROPERTY OWNERS, CHIKAMING
TOWNSHIP, ROBERT FORKER, JR., NEW
BUFFALO SAVINGS BANK FIFTH
THIRD BANK, SHORELINE BANK,
SEMCO ENERGY, INC., SEMCO ENERGY
GAS COMPANY, SBC AMERITECH
CORPORATION, MICHAEL L. JONES,
LAURA L. AVERY, and JULIA E.
PIETRAS,

   Defendants.

---

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur with the result of the lead opinion because I agree that plaintiffs'

request for relief should be granted. I write separately to clarify my view that the

circumstances surrounding the easement's creation show that it contains a latent

ambiguity and that the original grantors intended to allow utility access to

plaintiffs' property through the central drive easement. I respectfully dissent,

however, from the lead opinion's holding that the Land Division Act (LDA) does

not grant courts the power to alter substantive property rights.

## I. INTENT OF THE ORIGINAL GRANTORS

I concur with the lead opinion's conclusion that the original grantors

intended plaintiffs' property to have access to utilities through the central drive

easement, and I would grant plaintiffs' request for relief.[1] I also concur with the

---

[1] This holding applies to the southern half of the central drive easement. The northern half of the central drive easement was reserved before platting, and with language distinct from the language used in the south drive easement.

2

lead opinion's conclusion that the restrictive covenant does not bar plaintiffs from building on their property.

As the lead opinion noted, the cardinal rule of interpreting deeds and plats is to effectuate the intent of the parties. *Ante* at 7. To effectuate this rule, in light of the principle of freedom of contract, this Court has generally observed that "[i]f the language of a contract is clear and unambiguous, it is to be construed according to its plain sense and meaning . . . ." *City of Grosse Pointe Park v Michigan Muni Liability & Prop Pool*, 473 Mich 188, 197-198; 702 NW2d 106 (2005) (internal citation and quotation marks omitted). Where a contract is ambiguous, however, this Court may use extrinsic evidence to determine the intent of the parties. *Id.* at 198.

Extrinsic evidence may sometimes also be used to detect an ambiguity in a contract, depending on whether the ambiguity is latent or patent. *Id.* A patent ambiguity "'clearly appears on the face of a document, arising from the language itself.'" *Id.*, quoting Black's Law Dictionary (7th ed). Extrinsic evidence is generally not necessary to detect a patent ambiguity. In contrast, a latent ambiguity "'does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed.'" *Id.* Where there is a latent ambiguity, extrinsic evidence may be used not only to resolve the ambiguity, but also to prove the existence of the latent ambiguity. *Grosse Pointe Park,* 473 Mich at 198. See also *McCarty v Mercury Metalcraft Co*, 372 Mich 567, 575; 127 NW2d 340 (1964); *Ives v*

3

*Kimball*, 1 Mich 308, 313 (1849). In *Ives*, after explaining that a latent ambiguity may be shown by parol evidence, this Court highlighted the importance of this doctrine by stating that

> [t]here is no more useful, just and practical rule of law, than that which admits evidence of surrounding circumstances and collateral facts, within certain well defined limits, for the purpose of enabling courts to ascertain and carry into effect the intention of contracting parties. The cases in which this rule has been applied are almost innumerable. [*Ives,* 1 Mich at 313.]

This Court has applied the latent ambiguity doctrine to give easement language a meaning that becomes apparent only in light of the surrounding circumstances. See *Keller v Paulos Land Co*, 381 Mich 355; 161 NW2d 569 (1968); *McConnell v Rathbun*, 46 Mich 303; 9 NW 426 (1881). *Keller* is particularly instructive in this case. In *Keller*, the parties disagreed over the purpose of a "nonexclusive easement of ingress and egress," where the easement was landlocked within the defendant's property. *Keller*, 381 Mich at 360. The defendant argued that, in context, it was clear that the easement was only intended to be used for parking. *Id.* at 360-361. This Court concluded that the language was ambiguous because a landlocked easement is "not a use of ingress and egress within the common legal meaning," and accordingly it was appropriate for the Court to use oral testimony to determine the true intent of the parties. *Id.* at 362.

Similarly, in this case, the surrounding circumstances show that there was a latent ambiguity; therefore, extrinsic evidence should be used to determine and effectuate the intent of the parties. The central and south drive easements were

4

described in the deeds as "a non-exclusive right of way for driveway purposes." "Driveway purposes" is not so unclear as to create a patent ambiguity. But the parties' use of the south drive easement for utilities at the time the easements were created suggests that, as in *Keller*, the parties' understanding of "driveway purposes" was not limited to its "common legal meaning." *Keller*, 381 Mich at 362. Because there is a latent ambiguity, the court may look to extrinsic evidence to determine the intent of the parties. As explained in the lead opinion, extrinsic evidence shows that the grantors intended that the central easement could be used for utilities access for plaintiffs' property. Therefore, I concur that plaintiffs should be granted relief.

## II. LAND DIVISION ACT[2]

I respectfully dissent from the holding that the LDA does not grant courts the power to alter substantive property rights. I think that the majority that reached that holding errs in addressing this issue in this case. I also think that its reasoning is flawed and that its conclusion is too broad.

Most importantly, I do not think that it is necessary for this Court to reach this issue in this case. The lead opinion states that "[i]n this case, the LDA did not create new substantive property rights when the circuit court altered the plat to reflect that the central easement encompasses utility access" because "[t]his right existed with respect to the central easement since its inception . . . ." *Ante* at 14. I

---

[2] MCL 560.101 *et seq*.

5

agree. Accordingly, it is irrelevant to the outcome of this case whether, as a general proposition, the LDA allows courts to alter the underlying substantive rights of the property owners. Therefore, this Court does not need to address this issue.

Nonetheless, as I am forced to discuss it, I tend to disagree with the lead opinion's conclusion that "the LDA was never intended to enable a court to establish an otherwise nonexistent property right." *Ante* at 13-14. I think that there are some flaws in the lead opinion's reasoning and that this conclusion is too broad.

Both MCL 560.221 and 560.226(1) state that courts may vacate, correct, or revise a recorded plat. Section 226(1) lists several exceptions to this power, but otherwise does not explain when or why courts should vacate, correct, or revise a plat. The lead opinion reasons that the LDA's grant of power to the courts to vacate, correct, or revise a plat is not a substantive power because the act defines a plat as a map, and everybody knows that revising a map does not automatically revise the underlying substantive property rights. Regardless of whether the majority on this issue is correct in concluding that the LDA does not permit courts to alter property rights, I do not think that its reasoning is focused on the proper question.

The relevant question is not whether a plat is a map; rather, the question is whether the Legislature intended to give courts the power to alter substantive property rights by revising a map under the circumstances in a given case. The

6

lead opinion gives as an example that "[i]f one 'revises' a map of the United States to show Michigan encompassing half of the country, it does not make it so." *Ante* at 13. This statement is of course true of the average judge sitting at home with a book of Rand McNally maps and a permanent marker. But, if a duly empowered Legislature passed a statute stating that when a court revises the boundaries of a map, that revision has the legal effect of changing the boundaries, then a court's revision of a map would indeed create a substantive change.[3] If the lead opinion's conclusion is correct, the reason it is correct cannot be that a revision to a map, by definition, can never alter substantive property rights.

In addition to disagreeing with the lead opinion's reasoning, I tend to think that the lead opinion's statement that the LDA never permits courts to alter property rights through its power to vacate, correct, or revise a plat is too broad.[4]

---

[3] The act itself demonstrates that the Legislature in some instances intended that a plat not only reflect existing property rights, but also be the sole legal basis for creating that right. For example, MCL 560.253(1) states that "every dedication, gift or grant to the public or any person, society or corporation marked or noted as such on the plat shall be deemed sufficient conveyance to vest the fee simple of all parcels of land so marked . . . ." Under this provision of the LDA, if a plat is amended to include a dedication, then that amendment creates a property right. In other words, the act of amending the plat also amends a property right.

[4] For example, this Court has stated that § 226(1) is the *exclusive* remedy for landowners seeking to vacate, revise, or correct a private dedication. *Martin v Beldean*, 469 Mich 541, 542-543; 677 NW2d 312 (2004). Vacating a dedication on a plat alters property rights; if § 226(1) is the "exclusive" way to make this change, then it must be that the statute itself permits courts to alter property rights. In *Martin*, this Court held that a plaintiff had to bring an action to void a private dedication under the LDA and not as an action to quiet title. *Martin*, 469 Mich at 550-552. If the LDA was not the legal basis for the court's power to void a

7

Instead, I would state that the Legislature intended MCL 560.221 and 560.226(1) to permit courts to alter property rights in at least some circumstances. I will not attempt to exhaustively determine when the LDA grants courts the power to alter property rights because the facts of this case do not present a suitable basis for analyzing these issues. Regardless, I believe that this Court's approach to this issue should be more cautious, nuanced, and case-specific than the approach taken by the lead opinion.

CONCLUSION

I would affirm the Court of the Appeals result and vacate its reasoning. I think that the easement language was latently ambiguous and that the circumstances surrounding its writing show that the grantors intended plaintiffs' property to access utilities through the central drive easement. I respectfully dissent from the holding that the LDA never enables a court to alter property rights.

Michael F. Cavanagh
Elizabeth A. Weaver

dedication, then this Court would have held that the plaintiff was required to bring an action to quiet title *and* an action under the LDA.

8

S T A T E   O F   M I C H I G A N

SUPREME COURT

FRANK J. TOMECEK, JR., and JANIS H. TOMECEK,

      Plaintiffs-Appellees,

v                                       No. 134665

ANDREW LUCIAN BAVAS, JOYCE BAVAS, INEZ HILDEGARD BAVAS, STANLEY FRANCIS STASCH, JULIA STASCH, MARTHA STASCH, PATRICIA M. CURTNER, TIMOTHY V. McGREE, PETER A. STRATIGOS, ALICE M. STRATIGOS, PAMELA KRUEGER, DEVEREAUX BOWLY, JR., DAVID N. DERBYSHIRE, ELLEN R. LaFOUNTAIN, JONATHAN RODGERS, ROYAL KENNEDY RODGERS, LEE STAHL, III, and SUSAN STAHL,

             Defendants-Appellants,
and

INDIANA MICHIGAN POWER COMPANY, doing business as AMERICAN ELECTRIC POWER COMPANY, INC., MICHIGAN DEPARTMENT OF LABOR AND ECONOMIC GROWTH, and BERRIEN COUNTY DRAIN COMMISSIONER,

             Defendants-Appellees,
and

DANIEL JOHNSON, SCOTT LOESS, KATHLEEN LOESS, JANE HENKLE, RICHARD CRAGG, LOIS ZYER, ARTHUR C. MERTZ REVOCABLE TRUST, PETER

LEVY, BENITA LEVY, LAKESIDE
PROPERTY OWNERS, CHIKAMING
TOWNSHIP, ROBERT FORKER, JR., NEW
BUFFALO SAVINGS BANK FIFTH
THIRD BANK, SHORELINE BANK,
SEMCO ENERGY, INC., SEMCO ENERGY
GAS COMPANY, SBC AMERITECH
CORPORATION, MICHAEL L. JONES,
LAURA L. AVERY, and JULIA E.
PIETRAS,

   Defendants.

_____

WEAVER, J. (*concurring in part and dissenting in part*).

  I partially concur with and dissent from the lead opinion's conclusions for the reasons stated in Justice Cavanagh's partial concurrence and partial dissent, which I join.

               Elizabeth A. Weaver

S T A T E   O F   M I C H I G A N

SUPREME COURT

FRANK J. TOMECEK, JR., and JANIS H.
TOMECEK,

        Plaintiffs-Appellees,

v                                     No. 134665

ANDREW LUCIAN BAVAS, JOYCE
BAVAS, INEZ HILDEGARD BAVAS,
STANLEY FRANCIS STASCH, JULIA
STASCH, MARTHA STASCH, PATRICIA
M. CURTNER, TIMOTHY V. McGREE,
PETER A. STRATIGOS, ALICE M.
STRATIGOS, PAMELA KRUEGER,
DEVEREAUX BOWLY, JR., DAVID N.
DERBYSHIRE, ELLEN R. La FOUNTAIN,
JONATHAN RODGERS, ROYAL
KENNEDY RODGERS, LEE STAHL, III,
and SUSAN STAHL,

           Defendants-Appellants,
and

INDIANA MICHIGAN POWER
COMPANY, doing business as AMERICAN
ELECTRIC POWER COMPANY, INC.,
MICHIGAN DEPARTMENT OF LABOR
AND ECONOMIC GROWTH, and
BERRIEN COUNTY DRAIN
COMMISSIONER,

           Defendants-Appellees,
and

DANIEL JOHNSON, SCOTT LOESS,
KATHLEEN LOESS, JANE HENKLE,
RICHARD CRAGG, LOIS ZYER, ARTHUR
C. MERTZ REVOCABLE TRUST, PETER

LEVY, BENITA LEVY, LAKESIDE
PROPERTY OWNERS, CHIKAMING
TOWNSHIP, ROBERT FORKER, JR., NEW
BUFFALO SAVINGS BANK FIFTH
THIRD BANK, SHORELINE BANK,
SEMCO ENERGY, INC., SEMCO ENERGY
GAS COMPANY, SBC AMERITECH
CORPORATION, MICHAEL L. JONES,
LAURA L. AVERY, and JULIA E.
PIETRAS,

        Defendants.

YOUNG, J. (*concurring in part and dissenting in part*).

I concur with Justice Kelly's opinion insofar as it holds that the Land Division Act does not give trial courts the authority to alter substantive property rights and it declines to address the common-law doctrine of easements by necessity. I write only to express misgivings with regard to her disposition on whether the grantors of the plaintiffs' easement intended to give the plaintiffs utilities access in addition to ingress and egress. Justice Kelly's explanation that the grantors intended that the plaintiffs use their easement in the same manner that the defendants used their easement at the time of the grant is plausible (and quite possibly correct).[1] Nevertheless, I am not convinced that the mere fact that the defendants have used their easement for utilities access gives the plaintiffs the right to use their *separate* easement similarly. Because there is insufficient

---

[1] Although there are many nominal defendants in this case, I use the term "defendants" throughout this opinion to refer only to those defendants who own property in the O.T. Henkle Subdivision.

2

evidence of the grantors' actual intent concerning the plaintiffs' *particular* easement at the time the easement was created, I cannot assent to Justice Kelly's ultimate result that interprets the plaintiffs' easement as encompassing utilities access. I therefore respectfully dissent from Justice Kelly's determination of the grantors' intent, although I concur with Justice Kelly insofar as she interprets the Land Division Act and declines to reach the common-law doctrine of easements by necessity.[2] Rather than affirm the Court of Appeals result, which grants the plaintiffs' motion for summary disposition, I would instead remand this case to the Berrien County Trial Court for trial.

Robert P. Young, Jr.
Maura D. Corrigan
Stephen J. Markman

---

[2] Because this case came before this Court on cross-motions for summary disposition, and because the question of the grantors' intent would remain open on remand, it is not necessary at this point for me to determine whether the doctrine of easement by necessity should be expanded to include utilities access.

3