NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0361n.06

Case Nos. 09-1582/09-1694

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jun 11, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DEMOLITION CONTRACTORS, INC., dba PITSCH WRECKING CO. | ) ) ) | |
| Plaintiff - Appellee Cross Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| WESTCHESTER SURPLUS LINES INS. CO., | ) ) ) | |
| Defendant - Appellant Cross Appellee, | ) ) | |
| COMPLEX INSURANCE CLAIMS LITIGATION ASSOCIATION, | ) ) ) | |
| Amicus Curiae. | ) | |

BEFORE: CLAY and GILMAN, Circuit Judges; ZATKOFF, District Judge.[*]

**Lawrence P. Zatkoff, District Judge.**   This case involves a breach of contract action by

Plaintiff-Appellee Demolition Contractors, Inc. ("Demolition") against its insurer, Defendant-

Appellant Westchester Surplus Lines Insurance Co. ("Westchester"), seeking coverage for an

insurance claim under a general liability policy.  The district court denied Westchester's motion for

summary judgment.  The case was submitted to the district court for decision in a bench trial

consisting solely of stipulated exhibits and oral argument.  The district court determined that

---

[*] The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

Demolition was entitled to coverage of $100,000, minus a $25,000 deductible, for the claim at issue. The district court entered judgment in favor of Demolition in the amount of $75,000.

Westchester filed the instant appeal, arguing that the district court erred in denying its motion for summary judgment and in entering a judgment in favor of Demolition. Westchester concedes that its policy provides coverage for Demolition's claim, but it contends that because Demolition failed to comply with the policy's clear terms, any coverage is negated. Demolition filed a cross-appeal to the district court's entry of judgment, arguing that it is entitled to coverage under the policy in excess of $75,000. United Policyholders filed an amicus brief in support of Demolition. The Complex Insurance Claims Litigation Association filed an amicus brief in support of Westchester. For the following reasons, we **AFFIRM** the district court's entry of judgment.

## I. BACKGROUND

Demolition purchased a general liability insurance policy from Westchester, with a policy period of May 1, 2005, to May 1, 2006. Regarding coverage, the policy stated: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

The policy contained a "voluntary payments" provision, setting forth certain conditions and duties that an insured must follow in the event of an occurrence or claim, including that the insured may not make payments or assume obligations without the insurer's consent:

SECTION IV -- COMMERCIAL GENERAL LIABILITY CONDITIONS

\*\*\*

**2. Duties In the Event of Occurrence, Offense, Claim or Suit**

\*\*\*

2

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

The policy also contained the following "no action" provision:

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

\*\*\*

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Additionally, the policy included a Common Policy Condition, stating in part, "this policy's terms can be amended or waived only by endorsement issued by us [Westchester] and made a part of this policy."

During the summer of 2005, Demolition sold gravel to Smith Bros. Contracting, Inc. ("Smith Bros."), which Smith Bros. used as a gravel subbase to pave asphalt roads in the Autumn Ridge Subdivision in Greenville, Michigan. In the fall of 2005, portions of the asphalt roadways began to pit, pimple, and crack. Soil & Structures, Inc. investigated the cause of the road failure and determined that a clay mineral (ettingite) swelled, causing the roadway condition. Soil & Structures, Inc. recommended three options to repair the roads, one of which was the complete removal and replacement of the roads. In December 2005, Demolition was notified that the gravel it supplied to Smith Bros. was the source of the problem. Demolition thereafter filed an insurance claim under its

policy with Westchester. On January 11, 2006, Westchester acknowledged receipt of claim information from Demolition and advised Demolition that the claim had been assigned to Bruce Alles ("Alles") for handling.

Westchester retained Westshore Consulting ("Westshore") to conduct an engineering and environmental analysis of the roads. On February 24, 2006, Westshore sent a report to Alles that included "Environmental Analysis and Recommendations," which stated that the subbase in the Autumn Ridge roadways posed a potential environmental risk:

> The Chemical make up of the aggregate that is present as the subbase presents some potential environmental risk. Although there is no evidence that any of the metals or chloride have leached into the underlying native soils, the test data provides a likely indication that leaching could occur in the future. In addition, the test results suggest that leaching may occur at concentrations that could be harmful to the aquifer or nearby wetlands . . . . Even though there is no evidence of environmental contamination in the subsurface native soils or groundwater, the potential of future impact exists, and for this reason, Westshore recommends that the material be removed from the site and replaced with aggregate that does not have these characteristics.

Westchester issued a "Reservation of Rights" letter to Demolition on March 3, 2006, in which Westchester acknowledged that its policy provided coverage for the resulting damage to the bituminous pavement. However, the letter informed Demolition that the policy did not fully cover the cost of repairing the roadways. According to Westchester, the policy provided coverage for damage to the bituminous pavement, but not the remediation work generally:

> [Westchester] understands that the "property damage" sustained by the bituminous pavement was directly related to the formation of the mineral ettringite in the aggregate base [Demolition] supplied for this project. The [Westchester] policy provides coverage for the resulting damage to the bituminous pavement.

Westchester's letter also stated: "we are not waiving any policy defenses which may now exist or which may become known later under this policy" and that "all rights and defenses [Westchester]

4

may hereafter have or discover, under all of the terms, conditions, exclusions, insuring agreements and provisions of the policy are hereby reserved." Additionally, the letter stated that "[Westchester] does not waive its right to assert additional coverage defenses should other coverage issues become apparent."

Over the next several months, communications continued between Demolition and Westchester concerning the road repair and coverage of the claim. Prior to April 7, 2006, Demolition had taken steps to obtain a county permit for removal and replacement of the bituminous pavement. On April 12, 2006, Demolition's in-house counsel, Andrew Vredenburg ("Vredenburg"), informed Westchester that Demolition had decided to remove and replace the asphalt. On April 20, 2006, Vredenburg wrote a letter to Alles in response to the "Reservation of Rights" letter. Vredenburg's letter stated that he had reviewed Alles' letter and it appeared that Alles agreed that partial coverage was provided for the proposed roadway repair:

> As I understand it, you have agreed that [Westchester] will pay for the replacement of asphalt that was damaged as a result of the mineral ettringite being formed in the aggregate [Demolition] supplied to the owner and/or its contractor who constructed the roads in Autumn Ridge.

Vredenburg's letter briefly reviewed the underlying circumstances surrounding the damaged roadways, and stated that according to the engineers, including Westshore, ettringite is a natural-forming mineral that can occur in concrete, which resulted in the "pimpling" of the asphalt. Vredenburg acknowledged that "there appears to be no environmental problem with the site" and that "[a]lthough testing on the aggregate revealed a potential problem, no problem has developed to date." Vredenburg then requested that Alles reconsider his denial of coverage since Demolition

5

believed that coverage should be provided not only for the replacement of the asphalt and aggregate, but also for the remaining costs of repairing the roadways.

On April 21, 2006, Demolition commenced road repair and had nearly completed the removal of the asphalt by April 26, 2006. Westchester received Vredenburg's April 20, 2006, correspondence on April 26, 2006. On May 4, 2006, Alles called Demolition's insurance agent, Barb Simmons, and informed her that Westchester was offering Demolition $75,000 (net of Demolition's $25,000 deductible) with a policy release on the claim. Westchester restated the offer to Vredenburg on May 11, 2006. Demolition never accepted Westchester's offer to settle the claim, and did not otherwise respond to Westchester's offer through June, July, and August 2006. On September 12, 2006, Westchester received notice from Demolition that it had incurred costs of more than $200,000 in roadway repairs.

No final judgment by any court awarding money damages was ever entered against Demolition concerning the "property damage" to the roadways. No settlement and release of liability, signed by Westchester, was ever obtained with respect to the costs incurred by Demolition to repair the roadways.

Westchester denied insurance coverage for all of the costs incurred by Demolition in remediation of the Autumn Ridge roadways, claiming that Demolition violated the "voluntary payments" provision and the "no action" provision of the insurance policy, which purportedly relieved Westchester of any obligation for coverage under the unambiguous terms of the policy.

In the district court's order denying Westchester's motion for summary judgment, the district court stated that genuine issues of material fact existed with respect to:

6

1.  Westchester's knowledge and consent regarding the road repairs undertaken by Demolition; and

2.  Whether, based on public policy, Demolition was excused from abiding by the policy's terms.

Following a bench trial, the district court rendered the following findings of fact and conclusions of law:

A.  *Findings of Facts*

1.  Following its investigation of plaintiff's claim for insurance coverage for the removal and replacement of roadways in the Autumn Ridge subdivision, defendant notified plaintiff in writing that the policy provided coverage for damage to the bituminous pavement.

2.  In a response letter, plaintiff's counsel stated that he had reviewed Alles' letter and it appeared that Alles agreed that coverage was provided in part for the proposed remediation work at Autumn Ridge:

> As I understand it, you have agreed that [Westchester] will pay for the replacement of asphalt that was damaged as a result of the mineral ettringite being formed in the aggregate [Demolition] supplied to the owner and/or its contractor who constructed the roads in Autumn Ridge.

3.  Following defendant's representation of partial coverage for the claim, plaintiff undertook removal and replacement of the Autumn Ridge roadways, and thereafter sought reimbursement for costs incurred beginning on April 20, 2006.

4.  Defendant represented to plaintiff that defendant would pay $100,000 minus a $25,000 deductible in settlement of plaintiff's claim.

5.  Defendant's offer of payment was not made based on any express contingencies such as a "buy-back" of the policy, but instead represented payment for that portion of the projected costs covered under the insurance policy.

B.  *Conclusions of Law*

1.  Although partial coverage existed under the policy for plaintiff's claim, defendant has set forth a valid defense to coverage on the grounds that plaintiff failed to comply

with the policy provisions, including the policy's "voluntary payment" and "no action" clauses.

2. Nonetheless, defendant is estopped from denying coverage with respect to that portion of the claim that defendant admitted in writing was covered under the policy, and therefore, defendant is obligated to pay plaintiff $75,000, which represents payment for the costs that defendant determined were covered under the policy, minus plaintiff's deductible:

> a. defendant's acts or representations induced plaintiff to believe that partial coverage existed for the Autumn Ridge subdivision claim,

> b. plaintiff justifiably relied on its belief in undertaking remediation of the roadways, and

> c. as a result of its belief, plaintiff was prejudiced by incurring costs for removal and replacement of the roadways.

3. Plaintiff has failed to show that under Michigan law, the Autumn Ridge roadways posed an imminent environmental threat such that plaintiff believed that it had to repair the roads immediately, and thus, plaintiff was not excused from its violations of the policy's "voluntary payment" and "no action" clauses.

4. Plaintiff has failed to show that under Michigan law plaintiff is excused from its violations of the policy's "voluntary payment" and "no action" clauses because plaintiff "faced a possibility of fines from both [f]ederal and [s]tate agencies" and "a plethora of civil litigation," given the possible environmental damage, and therefore plaintiff was not justified in proceeding with the road repairs based on a duty to mitigate defendant's possible damages.

Given the above findings of fact and conclusions of law, plaintiff is not entitled to coverage under the commercial general liability policy of claimed costs of $167,000 that plaintiff incurred in repairing the Autumn Ridge roads. However, plaintiff is entitled to recover $75,000 for that portion of the road repair that defendant represented was covered under the policy prior to plaintiff proceeding with removal and replacement of the roadways.

There are three issues on appeal:

I.    Whether the district court erred by denying Westchester's motion for summary judgment;

II.     Whether the district court committed reversible error when it entered judgment in favor of Demolition and concluded that Westchester was estopped from denying coverage in the amount of $75,000; and

III.    Whether the district court committed reversible error when it concluded that Demolition was not excused from complying with the policy's terms due to an immediate environmental threat.

## II. LEGAL STANDARD

"[W]here summary judgment is denied and the movant subsequently loses after a full trial on the merits, the denial of summary judgment may not be appealed." *Barber v. Louisville & Jefferson County Metro. Sewer Dist.*, 295 F. App'x 786, 789 (6th Cir. 2008) (quoting *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990)).

"On appeal from a judgment entered following a bench trial, we review the district court's factual findings for clear error and its legal conclusions *de novo*." *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004) (citing *Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 721-22 (6th Cir. 2003)).

## III. ANALYSIS

### A.   WHETHER THE DISTRICT COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED WESTCHESTER'S MOTION FOR SUMMARY JUDGMENT

Since a full trial on the merits has occurred in this case, the district court's denial of Westchester's motion for summary judgment is not appealable. *See Barber*, 295 F. App'x at 789; *Jarrett*, 896 F.2d at 1016. Review of a denial of a motion for summary judgment after a full trial on the merits is appropriate only where the denial involved a pure question of law, rather than the presence of material disputed facts. *Barber*, 295 F. App'x at 789 (citing *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 441 (6th Cir. 2005), and *Paschal*

9

*v. Flagstar Bank*, 295 F.3d 565, 572 (6th Cir. 2002)). Here, the denial was based on the presence of material disputed facts. Thus, the district court's decision is not appealable.

**B.    WHETHER THE DISTRICT COURT COMMITTED REVERSIBLE ERROR WHEN IT ENTERED JUDGMENT IN FAVOR OF DEMOLITION AND CONCLUDED THAT WESTCHESTER WAS ESTOPPED FROM DENYING COVERAGE IN THE AMOUNT OF $75,000**

Westchester contends that the district court erred in concluding that Westchester is estopped from enforcing its valid defense to coverage under the policy's "no action" and "voluntary payments" provisions with respect to the $75,000 that Westchester admitted in writing was covered under the policy.

The parties agree that this case is governed by Michigan law. Under Michigan law, traditional contract doctrines such as waiver and estoppel can apply in insurance contracts where the facts support them. *See McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 819 (Mich. 2008). In order to assert its defense based on equitable estoppel, Demolition must prove that (1) Westchester's acts or representations induced Demolition to believe that the "no action" and "voluntary payments" provisions would not be enforced, (2) Demolition justifiably relied on this belief, and (3) Demolition was prejudiced as a result of its reliance on its belief that the "no action" and "voluntary payments" provisions would not be enforced. *Id.* (stating that an insurer would be estopped from enforcing a limitations-period clause under the policy if (1) the insurer induced the insured to believe the clause would not be enforced, (2) the insured justifiably relied on such belief, and (3) the insured was prejudiced as a result of relying on their belief that the clause would not be enforced); *Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 116 (Mich. 2008). *See also Morales v. Auto-Owners Ins. Co.*, 582 N.W.2d 776, 783 (Mich. 1998) (holding that an insurer was estopped from enforcing a policy provision requiring payments to be made by a

certain date where the insurer had repeatedly accepted late payments); *Allstate v. Snarski*, 435 N.W.2d 408, 411-12 (Mich. Ct. App. 1988) (upholding a jury's finding that an insurer waived a policy term requiring premiums to be paid by a certain date where an insurance agent verbally advised the insured to ignore notice from the insurer that coverage would lapse unless the premium was paid by that date); *Naparstek v. Citizens Mut. Ins. Co.*, 172 N.W.2d 205, 210 (Mich. Ct. App. 1969) (stating that "waiver and estoppel may be predicated upon silence or inaction of the [insurer] where it is apt to mislead and does mislead [the] insured" (citation omitted)). *But see Giffels v. Homeowners Ins. Co.*, 172 N.W.2d 540, 544-45 (Mich. Ct. App. 1969) (concluding that an insurer was not estopped from denying coverage where the insurer agreed to provide coverage "only if [the insured was] found legally liable" for the loss and the insured sought reimbursement for settling a claim against it without having been held legally liable).

### 1. Inducement

The district court concluded that Westchester is estopped from denying coverage to the extent of Westchester's offer to settle because Westchester induced Demolition to believe that partial coverage existed. Westchester argues that the district court misapplied the rule for estoppel set forth in *McDonald*, *supra*. According to Westchester, it should be estopped from fully denying coverage only upon a finding that it induced Demolition to believe that the "no action" and "voluntary payments" provisions would not be enforced. However, we need not decide this issue. In light of the district court's factual findings, we conclude that Westchester's acts and representations induced Demolition to believe that coverage would be provided because Westchester was not enforcing the policy's "no action" and "voluntary payments" provisions to the extent of its offer to settle the claim.

11

The following facts support such a conclusion: (1) Westchester informed Demolition that the policy provided coverage for damage to the bituminous pavement, (2) Westchester's own consultant, Westshore, recommended that the roads be replaced, (3) Westchester offered to settle the claim for $75,000 after Demolition notified Westchester of its intent to replace the roadways, and (4) Westchester remained silent while Demolition completed the repairs and incurred costs in excess of $200,000. Although none of Westchester's acts or representations specifically stated that Westchester would not enforce the "no action" or "voluntary payments" provisions, Westchester made representations that led Demolition to believe that it would reimburse Demolition in the amount of $75,000 for costs incurred in repairing the damaged roadways. Inherent in these representations was the notion that Westchester would not deny the coverage it agreed to provide in writing based upon other policy exclusions, such as the "no action" and "voluntary payments" provisions.

## 2. Justifiable Reliance

In considering whether Demolition justifiably relied on its belief that Westchester would reimburse it for at least $75,000 of its repair costs and not enforce the "no action" and "voluntary payments" provisions, the timeline of events is persuasive. Westchester voluntarily notified Demolition that the policy provided coverage for the damage to the pavement *before* Demolition undertook any steps to begin making repairs. Demolition then wrote a letter to Westchester, stating the following: "As I understand it, you have agreed that [Westchester] will pay for the replacement of asphalt that was damaged[.]" Westchester did not respond to Demolition by stating that Demolition had somehow misinterpreted Westchester's previous statements regarding coverage. Then, after Demolition notified Westchester of its intention to repair the roads, and after Demolition

12

began making repairs, Westchester offered to reimburse Demolition for $75,000. Finally, despite Westchester's prior acknowledgment regarding coverage and its $75,000 offer, Westchester remained silent while Demolition completed the repairs and incurred costs in excess of $200,000. Given these events, and the circumstances under which they occurred, Demolition was justified in believing that it would be reimbursed for at least $75,000 of its costs.

Westchester contends that Demolition was not justified in believing that the "no action" and "voluntary payments" provisions would not be enforced because Westchester informed Demolition in its "Reservation of Rights" letter that Westchester was preserving "all policy defenses which may now exist or which may become known later under this policy." Westchester relies heavily on *Giffels*, *supra*, in support of its argument that, despite its agreement to provide coverage, it should not be estopped from enforcing other policy provisions. In *Giffels*, the court held that an insurer was not estopped from denying coverage where the insurer agreed to provide coverage to the insured "only if [the insured was] found legally liable" for the loss in question, and the insured sought reimbursement without having been held legally liable for any loss. 172 N.W.2d at 544-45. However, the facts in *Giffels* are distinguishable from the facts in this case. Unlike the insurer in *Giffels*, Westchester did not inform Demolition that it would provide coverage for the damaged pavement *only if* Demolition complied with the "no action" and "voluntary payments" provisions. Westchester's "Reservation of Rights" letter lacked the specificity of the offer in *Giffels* and was insufficient to inform Demolition that, despite Westchester's express statement that it would provide coverage for the damaged pavement and its subsequent offer, Westchester still intended to enforce the policy's "no action" and "voluntary payments" provisions to preclude coverage.

13

### 3. Prejudice

As Demolition incurred costs in excess of $200,000 under the belief that it would be reimbursed for $75,000, Demolition was prejudiced by relying on its belief that the "no action" and "voluntary payments" provisions would not be enforced. Thus, we find that the district court did not err in concluding that Westchester is estopped from denying coverage in the amount of $75,000.

**C.** **WHETHER THE DISTRICT COURT COMMITTED REVERSIBLE ERROR WHEN IT CONCLUDED THAT DEMOLITION WAS NOT EXCUSED FROM COMPLYING WITH THE POLICY'S TERMS DUE TO AN IMMEDIATE ENVIRONMENTAL THREAT**

Demolition argues that it should be excused from complying with the policy's "no action" and "voluntary payments" provisions on public-policy grounds, such that it is not precluded from seeking recovery beyond $75,000. Specifically, Demolition claims that because the roadways created an imminent environmental threat, it was forced to repair the roads immediately in order to mitigate damages from civil litigation and fines from federal and state agencies.

However, Demolition's arguments are not supported by the facts or binding precedent. Contrary to Demolition's assertion, a fair reading of the Westshore report demonstrates that there was no imminent environmental threat requiring immediate repair. The report makes no mention of an immediate need to repair the roadways, nor does it indicate, as Demolition contends, that "a simple rain could have triggered an environmental leaching disaster." Rather, the Westshore report stated that "there is no evidence that any of the metals or chloride have leached into the underlying native soils" but that "leaching could occur in the future."

Similarly, there is no factual support for Demolition's assertion that it faced an imminent threat of civil litigation and/or fines from federal and state agencies. No evidence has been presented that legal action was taken against Demolition arising out of the roadway failure, or that state or

14

federal agencies threatened Demolition with fines in the event the roadways were not immediately repaired. Furthermore, the cases cited by Demolition in support of its public policy argument are both non-binding and factually distinguishable. *See Gov't Interinsurance Exch. v. City of Angola*, 8 F. Supp. 2d 1120, 1134-35 (N.D. Ind. 1998) (holding that an insured was excused from complying with the policy's "voluntary payments" provision where the insured voluntarily remediated a petroleum spill after surrounding groundwater had been contaminated and the Indiana Department of Environmental Management notified the insured that it would incur a $25,000 per day fine until the contamination was removed); *Leebov v. U.S. Fid. & Guar. Co.*, 165 A.2d 82, 84 (Pa. 1960) (recognizing that an insured's duty to mitigate damages by immediately repairing damage from a landslide where "disastrous consequences might have befallen the adjoining and nearby properties").

Accordingly, we find that the district court did not commit reversible error in concluding that Demolition was not excused from complying with the policy's clear terms in the absence of an immediate environmental threat, and that Demolition is therefore precluded from seeking recovery beyond $75,000.

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's entry of judgment in favor of Demolition in the amount of $75,000.