NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0384n.06

No. 16-1264

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 30, 2017
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| EMPLOYERS INSURANCE OF WAUSAU, et al., | ) |
| | ) |
| Plaintiffs-Appellees, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE WESTERN |
| MCGRAW EDISON COMPANY, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendant-Appellant. | ) |

Before: DAUGHTREY, MOORE, KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. In the 1950s, the McGraw-Edison Company owned a plot of land in Bloomfield, New Jersey (the "McGraw Bloomfield property"), where it operated two battery factories: the Primary Battery plant and Storage Battery plant. McGraw sold the Storage Battery plant in 1960, and later transferred the Primary Battery plant to a subsidiary called Battery Products, Inc. Thereafter, Cooper Industries acquired McGraw and discovered that several of McGraw's factories, including the Primary Battery plant, had potentially contaminated the environment. Cooper asked its insurers to cover its liabilities for the cleanup; in response, they sued Cooper in the Western District of Michigan, seeking a declaration that the contamination was not covered by their policies. Cooper and its insurers settled that suit in 1989. Per their settlement agreement, Cooper released any future claims arising from contamination at five facilities, including one in Bloomfield, which the parties called the "McGraw-Edison Battery Products Plant facility." Twenty years later, the United States Environmental Protection Agency notified Cooper that the entire McGraw Bloomfield property—including both the Primary Battery plant and Storage Battery plant—might have contributed to pollution in the Passaic River. In 2014, Cooper's insurers returned to federal court, arguing that the 1989 settlement agreement barred Cooper from seeking insurance coverage for the federal EPA's environmental claims. The district court agreed, holding that Cooper's release of its claims for

the "Battery Products Plant facility" included a release for any pollution migrating from the McGraw Bloomfield property as a whole—including, therefore, the Storage Battery plant— rather than just the Primary Battery plant. We respectfully disagree and reverse.

I.

Thomas Edison began manufacturing batteries in New Jersey over 100 years ago. His company, Thomas A. Edison, Inc., managed two adjacent battery plants there, located on land straddling the line between Bloomfield and Belleville. The Primary Battery Division operated one plant, while the Storage Battery Division operated the other. Thomas A. Edison, Inc. thereafter merged with McGraw Electric Company, and the new McGraw-Edison Company took over both battery divisions. In 1960, McGraw-Edison sold the Storage Battery plant to another battery company. Meanwhile, the Primary Battery plant continued making batteries under McGraw's management.

In 1984, a heavy rainstorm caused the Primary Battery plant's wastewater-treatment system—also called a "lagoon" or "settling pond"—to overflow into a neighbor's yard. The neighbor complained to the New Jersey Department of Environmental Protection, which sent McGraw a notice of potential contamination. The notice ordered McGraw to investigate soil and groundwater contamination at its Belleville facility. A year later, McGraw transferred the Primary Battery plant to a subsidiary, Battery Products, Inc. Meanwhile, McGraw itself became a subsidiary of Cooper Industries. Cooper, McGraw, and Battery Products, Inc. (collectively, "Cooper") began investigating the contamination in and around the Primary Battery plant. Parallel government investigations revealed that several other McGraw facilities around the country had potentially polluted the environment. In 1986, Cooper asked its insurers to cover its investigation costs and potential liability for that pollution.

That same year, the insurers sued Cooper in federal court in Michigan, seeking a declaration that the relevant insurance policies did not cover Cooper's liability for the pollution. Cooper responded by filing a "Counterclaim and Crossclaim." In Count III of the Counterclaim, Cooper explained that it was seeking coverage for its liability "for contamination allegedly from [McGraw's] Battery Products Plant in Bloomfield, New Jersey[.]" Cooper described the "Battery Products Plant" as a factory that manufactured "battery products" and that "McGraw

ha[d] owned and operated" since 1959. Cooper also alleged that, after 1959, contamination had been "introduced into settling ponds on the Battery Products site" and had thereafter entered New Jersey's groundwater. Over the next three years, the New Jersey Department of Environmental Protection continued to investigate the Primary Battery plant for environmental contamination. Eventually, the investigation also included two lagoons on the adjacent land, where McGraw's Storage Battery plant had been. When Cooper and the Department discovered contamination in those lagoons, Cooper agreed to clean them up.

Cooper and its insurers settled the insurers' declaratory-judgment lawsuit and Cooper's counterclaim in 1989. Per the settlement agreement, the insurers paid Cooper an undisclosed sum of money and Cooper released any future claims arising from "[t]he McGraw-Edison Battery Products Plant facility located in Bloomfield, New Jersey and anything released, escaping, or migrating . . . from the site including contamination of the groundwaters of the State of New Jersey as described in [Count III of] the Counterclaim and Cross-Claim[.]" Elsewhere in the agreement, the parties specified that Michigan law governed the agreement's interpretation and that "any dispute" over its terms "shall be commenced and resolved in the United States District Court for the Western District of Michigan, Southern Division." In December 1989, the district court incorporated the settlement agreement into its order of dismissal.

Twenty years later, the federal EPA notified Cooper that the McGraw Bloomfield property, including both the Primary Battery plant and Storage Battery plant, might have polluted the Passaic River. Cooper sued its insurers in New Jersey state court, claiming an entitlement to coverage for the environmental contamination. The insurers then returned to federal court in Michigan, seeking a declaration that, per the 1989 settlement agreement, Cooper had released its insurance claims. Cooper conceded that it had released any claim for coverage that involved contamination escaping from the Primary Battery plant (which Battery Products, Inc., had operated in the 1980s). But Cooper argued that the agreement permitted its claims for any contamination originating from the Storage Battery plant. Cooper also argued that the district court should abstain from hearing the case because of the pending New Jersey lawsuit.

The district court rejected Cooper's abstention argument and granted the insurers' motion for declaratory relief, reasoning that "the only fair way" to interpret the term "McGraw-Edison

Battery Products Plant facility" as used in the settlement agreement was as a reference to the entire McGraw Bloomfield property, including the Storage Battery plant. This appeal followed.

## II.

### A.

As an initial matter, Cooper argues that the district court should not have exercised jurisdiction over this declaratory-judgment action. We review that decision for an abuse of discretion. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008). A federal court should abstain from ordering declaratory relief if doing so would amount to "[g]ratuitous interference" with a pending state-court action that involves the same state-law issues and the same parties as the federal action. *Id.* at 559 (citations omitted); *see Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, 495 (1942).

Cooper argues that the district court should have left the issue in this case—*i.e.*, whether the settlement agreement released Cooper's pending claims for insurance coverage—for the New Jersey court to decide. But the settlement agreement itself includes a mandatory forum-selection clause, which states that "any dispute" over the agreement's terms "shall be commenced and resolved" in federal court in the Western District of Michigan. Cooper has neither challenged the validity of that clause nor explained why it "should not be enforced." *See Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 929 (6th Cir. 2014). Hence the court did not abuse its discretion in exercising its jurisdiction per the clause's terms here.

### B.

Cooper argues that the district court wrongly interpreted the settlement agreement to release its insurance claims for pollutants migrating from anywhere on the McGraw Bloomfield property, rather than from only the Primary Battery plant. We review de novo the district court's interpretation of the settlement agreement. *See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (citing *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996)).

Michigan "law presumes that . . . the actual words used in the contract" embody the parties' intent. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106,

124 (Mich. 2005). Thus, we start with the contract's text to determine if its terms, standing alone, are unambiguous. In the settlement agreement, Cooper released its insurance claims for "[t]he McGraw-Edison Battery Products Plant facility located in Bloomfield, New Jersey and anything released, escaping, or migrating . . . from the site including contamination of the groundwaters of the State of New Jersey as described in [Count III of] the Counterclaim and Cross-Claim[.]" The parties now dispute the meaning of the term "McGraw-Edison Battery Products Plant facility" as used in the agreement.

According to Cooper, the term "Battery Products Plant facility" refers to only the Primary Battery plant—the factory that McGraw transferred to its wholly owned subsidiary, Battery Products, Inc., in 1985. The settlement agreement supports this position. Per the agreement, Cooper released its insurance claims for several other "Plant facilities" across the country, and the contracting parties named each one according to the McGraw division that had managed it. Besides those sites, the agreement also lists, in Exhibit C, over 30 other McGraw facilities where Cooper was aware of potential claims for environmental contamination. Each facility is named after the entity or division operating it, with names including the "Service Division Facility," the "Bussman Facility," and the former "Toastmaster" and "Worthington" facilities. These names show that the contracting parties had a convention for identifying the facilities in the agreement based on the entities that operated them. Under that convention, the Battery Products Plant facility refers to the Primary Battery plant, which Battery Products, Inc. operated, and which does not include the Storage Battery plant.

Moreover, the settlement agreement incorporates the Counterclaim by reference, and Cooper's description of the "Battery Products Plant" in the Counterclaim confirms that the settlement's release encompassed only contamination escaping from the Primary Battery plant. In the Counterclaim, Cooper describes the Battery Products Plant as the property that "McGraw has owned and operated" since 1959. At the time Cooper filed the Counterclaim, the Primary Battery plant was the only Bloomfield factory that fit that description. Cooper also used lower-case letters to write the phrase "battery products" when describing how the Battery Products Plant "engaged in the manufacture of battery products." But Cooper capitalized the term when referring to the "Battery Products site." Capitalization indicates that a phrase "is a proper noun designating 'a particular person, place, or thing.'" *In re B.A.D.*, 690 N.W.2d 287, 292 (Mich. Ct.

App. 2004) (citation omitted). And the only particular entity to which "Battery Products" could refer in the Counterclaim is Battery Products, Inc. *See id.* The settlement agreement's explicit reference to the Counterclaim thus indicates that the agreement was likewise using "Battery Products" as shorthand for Battery Products, Inc.

Despite all these proofs that the "Battery Products Plant facility" referred to the Primary Battery plant, the insurers argue that the settlement agreement and the counterclaim unambiguously refer to the entire McGraw Bloomfield facility. They make two basic arguments. First, they contend that the settling parties could not have been referring only to land owned by Battery Products, Inc., because the settlement agreement neither mentions Battery Products, Inc. by name nor includes the word "Inc." when referring to the Battery Products Plant facility. Rather, the insurers say, "Battery Products" is a generic reference to the batteries produced by the entire McGraw Bloomfield property, which until 1960 included the Storage Battery plant. But nowhere else in the settlement agreement did the contracting parties name a facility after the products it made, much less refer to those products as a proper noun. And the parties did not specify what type of corporate entity operated some of the other facilities referenced in the agreement, including the "Worthington" and "Bussman" facilities. Yet entities with those names plainly operated those facilities. The insurers provide no explanation for why the parties would depart from their convention when naming the Battery Products Plant facility but nowhere else. Moreover, no reasonable drafter who meant to refer to both the Primary Battery and Storage Battery plants would have named the Bloomfield facility after "Battery Products"—a phrase identical to the name of an entity managing only the Primary Battery plant.

Second, the insurers contend that the settlement's release must have encompassed the entire Bloomfield property because, when the parties settled in 1989, New Jersey's investigation and Cooper's remediation included the two lagoons on the Storage Battery site. In making this argument, however, the insurers openly rely on extrinsic evidence—which they cannot do unless they first identify a specific contractual ambiguity that the extrinsic evidence would clarify. *See City of Grosse Pointe Park*, 702 N.W.2d at 113-14. And the insurers have not tried to identify any such ambiguity. Nor do we think that the parties incorporated the extrinsic documents by reference into the settlement agreement. Under Michigan law, "the parties must manifest clearly [their] intent to incorporate" external documents into a contract. *NILAC Int'l Mktg. Grp. v.*

*Ameritech Servs., Inc.*, 362 F.3d 354, 358 n.3 (6th Cir. 2004) (citing *Forge v. Smith*, 580 N.W.2d 876, 881 & n.21 (Mich. 1998)). And here there is no indication whatever that the parties meant to incorporate the various documents (many of which were internal to the New Jersey Department of Environmental Protection) that the insurers rely upon now.

The insurers' contention is also without merit even taken on its own terms. The settlement agreement expressly releases any claim for not only contamination on the Battery Products site but also for "anything released, escaping, *or migrating . . . from the site*[.]" (emphasis added). The release would therefore encompass contamination that migrated from the Battery Products site to the Storage Battery lagoons. That the parties knew there was contamination on the Storage Battery property thus does not mean the release must encompass any contamination originating from the Storage Battery Plant.

*        *        *

In summary, the settlement agreement's reference to the "McGraw-Edison Battery Products Plant facility" unambiguously referred to the plant operated by Battery Products, Inc., rather than to the Bloomfield site as a whole. The district court's January 27, 2016 order is therefore reversed.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** This case asks us to determine whether a 1989 Settlement Agreement is ambiguous. The Settlement Agreement released insurers from coverage as to a battery manufacturing facility in Bloomfield, New Jersey. Cooper Industries argues that the Settlement Agreement unambiguously refers only to the facility that manufactured primary batteries, not to the adjacent facility that manufactured storage batteries. The insurers argue that the Settlement Agreement unambiguously refers to both the primary battery manufacturing operation and storage battery manufacturing operation because they were part of a single facility, not two separate facilities. The district court wrote a well-reasoned opinion concluding that the Settlement Agreement unambiguously refers to a single facility that manufactured both primary and storage batteries. The majority has written a well-reasoned opinion concluding that the Settlement Agreement unambiguously refers to only the primary battery facility, not the separate storage battery manufacturing facility. I conclude that the Settlement Agreement is ambiguous, and I would vacate the district court's judgment and remand for an evidentiary hearing.

In its opinion concluding that the Settlement Agreement unambiguously referred to the entire battery manufacturing operation, the district court said:

> The first and most obvious problem is that the term the parties used is not the phrase that Cooper wants it to be. The parties referred simply to "Battery Products," and not to "Battery Products, Inc." The term is capitalized, but not defined anywhere else in the papers, and so the term must glean meaning from the overall context of its use. Reading into the term the corporate entity limits that Cooper urges is not warranted by the text or context. Second, the most natural referent for the term "Battery Products" is the 1984 notice letter, which is the triggering event for coverage purposes. And at that time the corporate entity "Battery Products, Inc." did not even exist. . . . [T]hird and most important, the overall point of the whole settlement was to prepare a comprehensive identification of insurance exposures, and then divide them by site into released sites or on-notice sites. Reading the Agreement as Cooper urges would disrupt that design by effectively creating a third possibility: namely, a site that everyone knew was contaminated, and that the parties described in 25-year-old language on either the "Settled Site" or "On Notice" site exhibit, but that parties today are now describing in somewhat different words. On this record there is no basis to do so.

R. 400 (Opinion at 13) (Page ID #2887).

The majority opinion provides a different analysis:

> Cooper released its insurance claims for several other "Plant facilities" across the country . . . . Each facility is named after the entity or division operating it, with names including the "Service Division Facility," the "Bussman Facility," and the former "Toastmaster" and "Worthington" facilities. These names show that the contracting parties had a convention for identifying the facilities in the agreement based on the entities that operated them. Under that convention, the Battery Products Plant facility refers to the Primary Battery plant, which Battery Products, Inc. operated, and which does not include the Storage Battery plant. . . . Moreover, . . . [i]n the Counterclaim, Cooper describes the Battery Products Plant as the property that "McGraw has owned and operated" since 1959. At the time Cooper filed the Counterclaim, the Primary Battery plant was the only Bloomfield factory that fit that description. Cooper also used lower-case letters to write the phrase "battery products" when describing how the Battery Products Plant "engaged in the manufacture of battery products." But Cooper capitalized the term when referring to the "Battery Products site." . . . The settlement agreement's explicit reference to the Counterclaim thus indicates that the agreement was likewise using "Battery Products" as shorthand for Battery Products, Inc.

Maj. Op. at 5–6.

The central dispute between these two analyses of the Settlement Agreement is the meaning of the term "Battery Products." In the above excerpt, the district court emphasizes that the term most likely refers to a 1984 letter written before the corporate entity Battery Products, Inc. existed. The district court also emphasizes that defining "Battery Products" to mean the facility eventually owned by Battery Products, Inc., rather than the entire facility that manufactured both primary and storage batteries, would undermine the purpose of the Settlement Agreement, which was "to prepare a comprehensive identification of insurance exposures, and then divide them by site into released sites or on-notice sites." R. 400 (Opinion at 13) (Page ID #2887). The majority opinion, by contrast, emphasizes that the Settlement Agreement referred to other facilities based on the entities the operated them, and that Battery Products, Inc. operated the battery products manufacturing facility but not the storage battery manufacturing facility. The majority also emphasizes that the capitalization of "Battery Products" indicates that the term is short for Battery Products, Inc., not a general reference to the products manufactured at the facility. Each of these opinions makes a convincing case for the wisdom of its proposed interpretation of the term "Battery Products" in the Settlement Agreement. Neither makes a convincing case that the other interpretation is an impermissible construction of the term.

A contract is unambiguous when it "fairly admits of but one interpretation." *Allstate Ins. Co. v. Goldwater*, 415 N.W.2d 2, 4 (Mich. Ct. App. 1987). This Settlement Agreement "fairly admits of" two interpretations. *Id.* Therefore, this Settlement Agreement is ambiguous. When a contract is ambiguous, the district court must hold an evidentiary hearing. *See RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 646 (6th Cir. 2001). Because the Settlement Agreement is ambiguous, the district court abused its discretion by failing to hold an evidentiary hearing.

I concur with the majority's judgment that the district court properly exercised jurisdiction over the declaratory-judgment action. I disagree with the majority's view that the contract is unambiguous, and I would remand for an evidentiary hearing. Therefore, I respectfully dissent.